## UNITED STATES *v.* KAISER.

No. 55. Argued March 23, 1960.—Decided June 13, 1960.

*Wayne G. Barnett* argued the cause for the United States. With him on the brief were *Solicitor General Rankin* and *Assistant Attorney General Rice.*

*Joseph L. Rauh, Jr.* argued the cause for respondent. With him on the brief were *Max Raskin, Harold A. Cranefield, John Silard, Carolyn E. Agger* and *Julius M. Greisman.*

MR. JUSTICE BRENNAN announced the judgment of the Court, and delivered an opinion in which THE CHIEF JUSTICE, MR. JUSTICE BLACK, and MR. JUSTICE DOUGLAS join.

This case presents the questions whether a labor union's strike assistance, by way of room rent and food vouchers, furnished to a worker participating in a strike constitutes income to him under § 61 (a) of the Internal Revenue Code of 1954;[1] and whether the assistance furnished to

---

[1] "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

"(1) Compensation for services, including fees, commissions, and similar items;

this particular worker, who was in need, constituted a "gift" to him, and hence was excluded from income by § 102 (a) of the Code.[2]

The respondent was employed by the Kohler Company in Wisconsin. The bargaining representative at the Kohler plant was Local 833 of the United Automobile, Aircraft, and Agricultural Implement Workers of America, CIO (UAW). In April 1954, the Local, with the approval of the International Union of the UAW, called a strike against Kohler in support of various bargaining demands in connection with a proposed renewal of their recently expired collective bargaining contract. The respondent was not a member of the Union, but he went out on strike. He had been earning $2.16 an hour at his job. This was his sole source of income, and when he struck he soon found himself in financial need. He went to the Union headquarters and requested assistance. It was the policy of the Union to grant assistance to the many Kohler strikers simply on a need basis. It made no difference whether a striker was a union member. The

---

"(2) Gross income derived from business;
"(3) Gains derived from dealings in property;
"(4) Interest;
"(5) Rents;
"(6) Royalties;
"(7) Dividends;
"(8) Alimony and separate maintenance payments;
"(9) Annuities;
"(10) Income from life insurance and endowment contracts;
"(11) Pensions;
"(12) Income from discharge of indebtedness;
"(13) Distributive share of partnership gross income;
"(14) Income in respect of a decedent; and
"(15) Income from an interest in an estate or trust."
[2] "Gross income does not include the value of property acquired by gift . . . ."

Union representatives questioned respondent as to his financial resources, and his dependents. He had no other job and needed assistance with respect to the essentials of life. He was single during the period in question, and the Union provided him with a food voucher for $6 a week, redeemable in kind at a local store; the voucher was later increased to $7.50 a week. The Union also paid his room rent, which amounted to $9 a week. If in need, married strikers and married strikers with children received respectively larger food vouchers.[3] The over-all policy of the International Union was not to render strike assistance where strikers could obtain state unemployment compensation or local public assistance benefits. But the former condition does not prevail in Wisconsin,[4] and local public assistance was available only on a showing of a destitution evidently deemed extreme by the Union.

The Union thought that strikers ought to perform picketing duty, but did not require, advise or encourage strikers who were receiving assistance to picket or perform any other activity in furtherance of the strike; but assistance ceased for strikers who obtained work. Respondent performed some picketing, though apparently no considerable amount. After receiving assistance for several months, he joined the Union. This had in no way been required of him or suggested to him in connection with the continued receipt of assistance.

The program of strike assistance was primarily financed through the strike fund of the International Union, which had been raised through crediting to it 25 cents of the

___

[3] After the increase referred to, married strikers without children received a $15 weekly food voucher; those with one child, an $18 voucher.

[4] Compare N. Y. Labor Law, § 592 (compensation payable after seven weeks of striking).

$1.25 per capita monthly assessment the International required from the local unions. The Local also had a small strike fund built up through monthly credits of 5 cents of the local members' dues, and contributions were received in some degree, not contended to be substantial, from other unions and outsiders. The constitution of the International Union required that it be the authorizing agency for strikes, and imposed on it the general duty to render financial assistance to the members on strike.[5]

During 1954, the Union furnished respondent assistance in the value of $565.54. In computing his federal income tax for the year, he did not include in gross income any amount in respect of the assistance. The District Director of Internal Revenue informed respondent that the $565.54 should have been added to his gross income and the tax due increased by $108 accordingly. Respondent paid this amount, and after administrative rejection of a refund claim, sued for a refund in the District Court for the Eastern District of Wisconsin. A jury trial was had, and the court submitted to the jury the single interrogatory whether the assistance rendered to respondent was a gift. The jury answered in the affirmative; but the court entered judgment for the Government, n. o. v., on the basis that as a matter of law the assistance was income to the respondent, and did not fall within the statutory exclusion for gifts. 158 F. Supp. 865.

By a divided vote, the Court of Appeals for the Seventh Circuit reversed. 262 F. 2d 367. It held alternatively

[5] Article 12, § 1 provides that "The International Executive Board . . . shall have the power to authorize strikes." Section 15 of that article provides that upon such authorization, "it shall be the duty of the International Executive Board to render all financial assistance to the members on strike consistent with the resources and responsibilities of the International Union."

The strike funds referred to are provided for by §§ 4 and 11 of Art. 16 of the International's constitution.

that the assistance was not within the concept of income of § 61 (a) of the Code, and that in any event the jury's determination that the assistance was a gift, and hence excluded from gross income by § 102 (a), had rational support in the evidence and accordingly was within its province as trier of the facts. We granted the Government's petition for certiorari, because of the importance of the issues presented. 359 U. S. 1010. Later, when the Government petitioned for certiorari in No. 376, *Commissioner* v. *Duberstein,* and acquiesced in the taxpayer's petition in No. 546, *Stanton* v. *United States,* it suggested that those cases be set down for argument with the case at bar, because they illustrated in a more general context the "gift" exclusion issues presented by this case. We agreed, and the cases were argued together. We conclude, on the basis of our opinion in the *Duberstein* case, p. 278, *ante,* that the jury in this case, as finder of the facts, acted within its competence in concluding that the assistance rendered here was a gift within § 102 (a). Accordingly, we affirm the judgment of the Court of Appeals. Therefore, we think it unnecessary to consider or express any opinion as to whether the assistance in fact constituted income to the respondent within the meaning of § 61 (a).

At trial, counsel for the Government did not make objection to any part of the District Court's charge to the jury or the "gift" exclusion. In this Court, the charge is belatedly challenged, and only as part of the Government's position that there should be formulated a new "test" for application in this area.[6] We have rejected that contention in our opinion in *Duberstein.* In the

---

[6] Specific challenge to the instructions was not made by the Government until its reply brief in this Court, and then only on the basis we have noted.

absence of specific objection at trial, or of demonstration of any compelling reason for dispensing with such objection, we do not here notice any defect in the charge, in the light of the controlling legal principles as we have reviewed them in *Duberstein*.

We think, also, that the proofs were adequate to support the conclusion of the jury. Our opinion in *Duberstein* stresses the basically factual nature of the inquiry as to this issue. The factual inferences to be drawn from the basic facts were here for the jury. They had the power to conclude, on the record, taking into account such factors as the form and amount of the assistance and the conditions of personal need, of lack of other sources of income, compensation, or public assistance, and of dependency status, which surrounded the program under which it was rendered, that while the assistance was furnished only to strikers, it was not a recompense for striking. They could have concluded that the very general language of the Union's constitution, when considered with the nature of the Union as an entity and with the factors to which we have just referred, did not indicate that basically the assistance proceeded from any constraint of moral or legal obligation, of a nature that would preclude it from being a gift. And on all these circumstances, the jury could have concluded that assistance, rendered as it was to a class of persons in the community in economic need, proceeded primarily from generosity or charity, rather than from the incentive of anticipated economic benefit. We can hardly say that, as a matter of law, the fact that these transfers were made to one having a sympathetic interest with the giver prevents them from being a gift. This is present in many cases of the most unquestionable charity.

We need not stop to speculate as to what conclusion we would have drawn had we sat in the jury box rather than those who did. The question is one of the allocation

of power to decide the question; and once we say that such conclusions could with reason be reached on the evidence, and that the District Court's instructions are not overthrown, our reviewing authority is exhausted, and we must recognize that the jury was empowered to render the verdict which it did.

*Affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE CLARK joins, concurring in the result.

In 1957 the Commissioner of Internal Revenue ruled that strike benefits paid by unions to strikers on the basis of need, without regard to union membership, were to be regarded as part of the recipient's gross income for income tax purposes. Rev. Rul. 57-1, 1957-1 Cum. Bull. 15. This ruling, if valid, governs this case. The taxpayer assails the ruling on three grounds. First, it is urged that in a series of rulings since 1920 the Commissioner has treated both public and private "subsistence relief" payments as not constituting gross income; that union strike benefits are not relevantly different from such "subsistence relief"; and that, with due regard to fair tax administration the Commissioner is constrained so to treat strike benefits in order to accord "equal treatment." Second, it is urged that both the Commissioner's rulings and court decisions have evolved an exclusion from the statutory category of "gross income," not explicitly stated in the statute, for "alleviative" receipts which do not result in any "enrichment," *i. e.*, "reparation" payments made in compensation for some loss or injury suffered by the recipient, and that strike benefits fall within this exclusion. Third, it is urged that strike benefits in general, or at least these strike benefits in particular, are to be deemed "gifts" within the meaning of the statutory exclusion from gross income of "gifts."

The taxpayer's first ground, that of the denial by the Commissioner to strike benefits of consistent treatment accorded other public and private "subsistence relief" payments, depends wholly upon past rulings of the Commissioner. In chronological order, the substance of the Commissioner's rulings deemed relevant to this ground by the taxpayer are set out in the Appendix to this opinion, *post,* p. 317. Set out as well are the rulings deemed pertinent by both parties to the theory of "alleviative" "reparations" receipts. The two theories overlap and much of the material relevant to them is the same. For each ruling are included the relevant facts, the Commissioner's conclusion, with his reasons and supporting authority when given.

What these rulings reveal largely depends on the viewpoint from which their meaning is read. Only two of the rulings set out in the Appendix, Numbers 1 and 21, dealt expressly with strike benefits, and Number 21 is the 1957 ruling here challenged. Putting this 1957 ruling aside, the conclusion may be drawn from these rulings that the Commissioner has not taxed receipts for which no services were rendered and no direct consideration was given, which did not arise out of an employment relation, and which were relatively small in amount and designed to enable the recipient to provide for his needs so they can be said to have been in a sense "subsistence" payments. None of the rulings holding payments taxable squarely contradicts such a conclusion.

Number 2, taxing union unemployment benefits, does not because the benefits there were paid by the union only to its members, and it can be supposed that members paid dues and lent their support in other ways, and thus there was consideration for the benefits.

Numbers 5, 15, 19, 24 and 25, all holding "subsistence" payments taxable, do not contradict it. The

payments in those cases were either made from funds partly or wholly sustained by the employer (Numbers 5 and 19), or the recipient had become eligible for benefits by paying into the fund from which the payments were made (Numbers 15, 24, and 25). Thus, it can be said that there was consideration for the payments, as there is, for example, consideration for insurance. In Numbers 24 and 25 it is in fact clear that the benefits paid varied with the recipient's contribution to the fund, and in Number 15 the fact is not stated one way or the other.

Number 1, the first strike-benefit ruling, does not squarely contradict a conclusion regarding "subsistence relief" payments made without consideration, because that also only concerned payments to union members.

Only Number 20 casts doubt on the conclusion, but not enough seriously to disturb it. In that ruling, concerning payments by the German Government to persons mistreated by the Nazis, it was left open that some payments, greater than the basis in the property confiscated by the Nazis, might be taxed as income, depending on the circumstances. But it can be reasoned that such payments were windfalls, not related to "subsistence," and in any event it was not clearly decided that they were income.

So, if one starts with a feeling or assumption that "subsistence relief," paid without the voluntary giving of consideration, has not been taxed by the Commissioner, material may be adduced to justify one's starting point.

There are two reasons why such reasoning does not conclude this case in my view. First, it is far from clear that, as a matter of law, the situation before us falls within a hypothetical "subsistence relief" category. Although the taxpayer paid no union dues before or during the taxable year, he did picket, and for part of the year he was a

member of the union. The Commissioner has regularly taxed "subsistence" payments by unions to union members as well as payments made from a fund to which the recipient contributed, or to which his employer contributed. See Numbers 1, 2, 15, 19, 24 and 25. Although it may be possible to distinguish all these rulings on the ground that here taxpayer's contribution to the union was minimal and that the strike benefits were in fact paid to members and non-members alike, they hardly furnish solid basis for a claim of uniform treatment of non-taxability by the Commissioner of payments like the strike benefits in this case.

My second objection is more basic. A fair evaluation of the administrative materials in the Appendix does not lead to the conclusion that the Commissioner has uniformly treated so-called "subsistence relief" as a relevant category of payments, and one not subject to tax. The only reason urged in this case for holding the Commissioner bound to follow rulings of non-taxability which he considers inapplicable is respect for an overriding principle of "equal" tax treatment. The Commissioner cannot tax one and not tax another without some rational basis for the difference. And so, assuming the correctness of the principle of "equality," it can be an independent ground of decision that the Commissioner has been inconsistent, without much concern for whether we should hold as an original matter that the position the Commissioner now seeks to sustain is wrong.

If I am right about the justification for asking this Court in this case to bind the Commissioner to former relevant rulings, with indifference to the correctness of his present position as an independent matter, the appropriate inquiry is not, "Can such and such a principle be drawn from the administrative rulings?" The right question is, "Is there any rational basis for the prior rulings which does not apply to the present case?" For only if there

is no such rational basis can the Commissioner be said to be denying "equal" treatment. Accordingly, I think that the rulings in which the Commissioner has not imposed a tax must be analyzed to ascertain whether the only principle which can explain them is a principle that "subsistence relief" is not taxable, or whether they can be reasonably explained, individually or severally, as the result of the application of some other principle or principles which do not govern the present strike benefits. I think the Commissioner's prior rulings of non-taxability can all be explained in a way which leaves the Commissioner free to assert that the strike benefits in this case are, unless "gifts," part of gross income, without denying "equal" treatment.

There are sixteen rulings set forth in the Appendix in which no tax was imposed: Numbers 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 20 and 22. Of these, reasons were clearly given in several, and in several others reasons were suggested though not spelled out. In no case was the reason given that the payment was "subsistence relief" and not taxable on that score. The nature of the payment as "subsistence" was mentioned only once, in Number 12, and it was used there as a characterization, not a reason, in a ruling which expressly accepted the nature of the payments as "gifts." The reasons which have been given suggest two other grounds upon which the Commissioner has excluded many of these payments from tax.

In Number 13, one reason for the ruling was stated to be that the payments "are considered gratuitous and spontaneous." In light of the circumstances of that case, involving disaster relief, it is natural to suppose that this language reflects an application of the principle that "gifts" are not part of gross income. See also Number 21, explaining Number 13.

310

In Numbers 3, 4, 6, 7, 14, 16, 20, and with regard to part of Number 12, the reasons given or suggested were that the payment involved was to be treated as compensation for a loss or injury that had been suffered, and that it was not taxable either because not greater in amount than the loss or because the thing lost or damaged had no ascertainable market value and so it could not be said that there had been any net profit to the taxpayer through the effectual exchange of the thing lost for the payment received. Although not articulated there, such reasons may well have applied also in Number 13, whose express ground was one of "gift."

The fact that a companion question or even the principal question in some of these cases (see Numbers 12 and 20) was whether the payment should reduce the amount of the deduction permitted by the Code for a casualty loss, emphasizes the explicit treatment of the payments as in return for a loss suffered.

Even in those cases where the thing lost or injured had no basis to the taxpayer for purposes of computing gain or loss, the language of reparation or compensation for loss was used. Thus in Number 3 damages for alienation of affections or defamation were treated as "in compromise" "for an invasion of" a "personal right." See also *McDonald* v. *Commissioner*, 9 B. T. A. 1340, referred to in Number 7. In Number 4 damages for breach of promise to marry were held not taxable because "[a] promise to marry is a personal right not susceptible of any appraisal in relation to market values." Numbers 6 and 14 involved death payments, and they were called "compensation for [the] loss [of life]." In Number 16 the payment to a mistreated prisoner of war was called "reimbursement."

The principle at work here is that payment which compensates for a loss of something which would not itself have been an item of gross income is not a taxable payment. The principle is clearest when applied to compensation for the loss of what is ordinarily thought of as a capital asset, e. g., insurance on a house which is destroyed. See Number 12. If a capital asset is sold for no more than its basis there is no taxable gain. The result, then, is the same if it is destroyed and there is paid in compensation no more than its basis. There are, to be sure, difficulties, not present where ordinary assets are involved, in applying this principle to compensation for the loss of something which has no basis and which is not ordinarily thought of as a capital asset, such as health or life or affection or reputation. With those difficulties we have no concern. The relevant question is whether the Commissioner has, or reasonably could have, applied a principle of reparation to deal with these cases, and the reasons given by him in Numbers 3, 4, 6, 7, 12, 14, 16, and 20 show that he has.

It is important to note that in *Commissioner* v. *Glenshaw Glass Co.*, 348 U. S. 426, 432, n. 8, we recognized just such treatment as "[t]he long history of departmental rulings holding personal injury recoveries nontaxable on the theory that they roughly correspond to a return of capital," and distinguished those rulings from the case of punitive damages, which we held not to be compensatory and therefore taxable. See also *United States* v. *Supplee-Biddle Hardware Co.*, 265 U. S. 189, 195.

The rationale of payments in compensation for a loss is not applicable to the present case. Even if we suppose that strike benefits are made to compensate in a sense for the loss of wages, the principle of payments in compensation does not apply because the thing compensated for, the wages, had they been received, would have been included in gross income. See *United States* v. *Safety*

*Car Heating & Lighting Co.*, 297 U. S. 88. That is not so in any of the rulings set out, where the thing lost and compensated for was not an item of taxable income, but an aspect of capital or analogous to capital, which obviously would not have been included in gross income had it been retained.

Taking stock, then, ten rulings of non-taxability are clearly explainable according to the two legitimate principles of "gift" and "compensation for loss" and should not bind the Commissioner to a principle that "subsistence relief" is not to be taxed. They are Numbers 3, 4, 6, 7, 13, 14, 15, 16, 20, and part of 12. The remaining portion of Number 12 concerns Red Cross disaster relief in the form of food and clothing. A ruling regarding inclusion in gross income was not asked for in that case, which concerned the use of the casualty loss deduction with regard to payments for the loss of capital assets. The relief was referred to as a "gift" in the ruling, and it was simply asserted, without explication, that, as to the food and clothing, "nor do they represent taxable income." It is not unreasonable to attribute this conclusion to an application of the principle of "gift," in light of the nature of the Red Cross as a charitable organization.

The rulings imposing no tax which thus remain unexplained as either dealing with "gifts" or payments in compensation for loss are Numbers 8, 9, 10, 11, 17, 18, and 22.

Numbers 8, 9 and 11 dealt with federal old age and death payments under the Social Security Act.

Numbers 10 and 17 dealt with unemployment payments under the Social Security Act. In Number 10 the payments were made by the States from the Federal Unemployment Trust Fund set up under that Act, and in Number 17 the payments were under the Social Security plan to cover federal employees.

Number 18 dealt with payments by the Government of Panama under an Act "basically similar" to the United States Social Security Act.

Number 22 dealt with a state payment to the blind, under a statute authorizing disbursement of money received from the United States for such a purpose.

Except for Number 22, all these payments came out of United States Social Security funds, or in the case of Number 18, a Panamanian analogue. The Commissioner has expressly treated these Social Security payments as related to each other. Number 9 relies on ruling Number 8, Number 17 relies on Number 10, and Number 18 on Number 11. These Social Security rulings rely on no others, and no others rely on them. On the other hand, the Commissioner has uniformly treated as taxable non-governmental payments, either by employers, unions, or "private" groups which have been similar to the Social Security benefits not taxed in their character as "subsistence relief," except for their private nature. See Numbers 1, 2, 5, 15, 19, 24 and 25. In the instances urged on us, the Commissioner has never treated such a non-governmental payment as non-taxable. Having uniformly accorded different treatment to small pension, old age, and unemployment payments, depending on their source, whether they arose out of a private arrangement on the one hand, or under the Federal Social Security program on the other, the Commissioner is not disentitled to treat these strike benefits as he has the non-governmental payments in the past. Surely there is a fair basis for differentiating, for income tax purposes, payments under a comprehensive scheme of federal welfare legislation from private payments, although their ultimate social purposes may be similar. To say that the Social Security rulings control private welfare schemes is to say that the Commissioner has not been entitled to find in the policy of the Social Security legislation, in relation

to the tax statutes, a reason for excluding its benefits from taxation, while this policy does not apply to other payments.

The remaining ruling, Number 22, deals with a state assistance payment to the blind. Aside from the differences which arise from the fact that this payment involved federal funds, which was set forth in the ruling as one of the relevant facts, it may well have been treated by the Commissioner as a gift, and not unreasonably so, for the blind are a common object of charity. In any case, this payment cannot alone create an administrative practice binding the Commissioner in the present case.

In summary, the relevant instances in which the Commissioner has ruled payments not taxable can all be explained according to principles other than the general principle of "subsistence relief" urged by the taxpayer. Putting aside the question of "gift," these principles do not cover the present case. Therefore the Commissioner, in seeking to tax these strike benefits, has not denied the taxpayer "equal" treatment.

No one argues that a tax principle regarding "subsistence relief" can be drawn from the statute or the cases. The taxpayer does urge, however, that a principle concerning "alleviative," "reparations" payments can and should be derived. I have already discussed why such a principle in my view does not include the present strike benefits, which compensate no loss but the loss of wages, and these would have been included in gross income if received. It might be argued that the Court should itself formulate a principle covering "subsistence relief" payments which would cover this case. There are controlling reasons for not formulating such a principle. Such new principles in the tax law are best left to Treasury initiative and congressional adoption. Moreover, the principle of excluding "subsistence" is already reflected in the $600 personal exemption and the graduated rates.

Finding these strike benefits not otherwise outside the statutory concept of "gross income," the decisive factor for me in this case is whether the strike benefits are to be deemed a "gift." As a matter of ordinary reading of language I could not conclude that all strike benefits are, as a matter of law, "gifts." I should suppose that a strike benefit does not fit the notion of "gift." A union surely has strong self-interest in paying such benefits to strikers. The implications arising out of the relationship between a union which calls a strike and its strikers are such that, without some special circumstances, it would be unrealistic for a court to conclude that payments made by the union for which only strikers qualify, even though based upon need, derive solely from the promptings of benevolence.

In this case, however, under instructions to the jury that

> "[t]he term 'gift' as here used denotes the receipt of financial advantage gratuitously, without obligation to make the payment, either legal or moral, and without the payment being made as remuneration for something that the Union wished done or omitted by the plaintiff. To be a gift, the payments must have been made with the intent that there be nothing of value received, or that they were not made to repay what was plaintiff's due but were bestowed only because of personal regard or pity or from general motives of philanthropy or charity. If the plaintiff received this assistance simply and solely because he and his family were in actual need and not because of any obligations, as above referred to, or any expectation of anything in return, then such payments were gifts,"

the jury found in a special verdict that the strike benefit payments to taxpayer were a "gift." These instructions certainly were not unfavorable to the Government.

For me, then, the question is whether there is anything in this particular record to justify a jury in finding, as it must be deemed to have found under these instructions, that the payment to taxpayer was, unlike the ordinary strike benefit, wholly a benefaction because of need, uninfluenced by the union's self-interest in promoting the success of the strike. The trial judge held that the record precluded the jury's verdict; the Court of Appeals reinstated that verdict.

On the evidence in this case, may the jury's verdict stand? There was evidence justifying the view that in the particular circumstances existing in Sheboygan at the time these benefits were paid, the union had assumed the functions normally exercised by private charitable organizations and governmental relief programs, in view of the excessive difficulty in getting adequate relief from them, so that these benefits were dispensed pursuant to such a charitable relief program in what, because of the strike, was a distressed area. The mere fact that the payments were made by the union to men participating in a strike called by the union does not as a matter of tax law conclude the case against a "gift." When the circumstances negating the business nature of the payment were strong enough, the Commissioner has ruled that even payments by an employer to his employees were gifts. See ruling Number 13 in the Appendix, and see also Rev. Rul. 59–58, 1959–1 Cum. Bull. 17, holding that the value of turkeys, hams, etc., given by an employer to employees at Christmas or some other holiday need not be reported as income. Although it is for me a very close question, I find sufficient evidence in the record to support the theory that in making these payments the union was exercising a wholly charitable function. On this view, restricted to the particular set of circumstances under which the special verdict was rendered, I would therefore hold the payment

in this case to be a gift and would affirm the judgment below.

I am well aware that this disposition of the case does not preclude different juries reaching different conclusions on the same facts. Some individualization of result is inevitable so long as it is left to courts to determine what is or is not a "gift." The diversities that may thus result are all the more inevitable in view of the scope left to the fact-finders—whether courts or jury—by our decision today in *Commissioner* v. *Duberstein* and *Stanton* v. *United States, ante,* p. 278.

## APPENDIX TO OPINION
## OF MR. JUSTICE FRANKFURTER.

*As used in the citations to materials in this Appendix, "O. D." refers to an Office Decision, "I. T." to an Income Tax Ruling, "Sol. Op." to a Solicitor's Opinion, "S." to a Solicitor's Memorandum, "G. C. M." to a General Counsel's Memorandum, "Rev. Rul." to a Revenue Ruling, and "T. D." to a Treasury Decision.*

1. O. D. 552, 2 Cum. Bull. 73 (1920).

"Benefits received from a labor union by an individual member while on strike are to be included in his gross income for the year during which received, there being no provision of law exempting such income from taxation."

2. I. T. 1293, I–1 Cum. Bull. 63 (1922).

"Amounts paid by an organized labor union as unemployed benefits to its unemployed members are required to be included in gross income of the recipients."

3. Sol. Op. 132, I–1 Cum. Bull. 92 (1922).

Damages for alienation of affections or defamation of character held not to be income. "In the light of these decisions of the Supreme Court [*Stratton's Independence* v. *Howbert,* 231 U. S. 399, and *Eisner* v. *Macomber,* 252

U. S. 189] it must be held that there is no gain, and therefore no income, derived from the receipt of damages for alienation of affections or defamation of personal character. In either case the right invaded is a personal right and is in no way transferable. While a jury endeavors roughly to compute the amount of damage inflicted, in the very nature of things there can be no correct estimate of the money value of the invaded rights. The rights on the one hand and the money on the other are incomparable things which can not be placed on opposite sides of an equation. If an individual is possessed of a personal right that is not assignable and not susceptible of any appraisal in relation to market values, and thereafter receives either damages or payment in compromise for an invasion of that right, it can not be held that he thereby derives any gain or profit." Revoking S. 1384, 2 Cum. Bull. 71, 72 (1920), which had held such damages taxable and relying on T. D. 2747 (unpublished) where "it was held that damages for personal injuries due to accident do not constitute income."

4. I. T. 1804, II–2 Cum. Bull. 61 (1923).

Damages for breach of promise to marry not gross income. "[A] promise to marry is a personal right not susceptible of any appraisal in relation to market values . . . ." Relying on Sol. Op. 132, *supra,* Number 3, and *Eisner* v. *Macomber,* 252 U. S. 189.

5. I. T. 1918, III–1 Cum. Bull. 121 (1924).

Payments to employees "involuntarily thrown out of employment because of lack of work in a certain industry." Payments made out of a fund established for that purpose under an agreement between "an association of manufacturers" and an "employees' association" and maintained by deductions from the wages of those em-

ployees who ratify the agreement and by equivalent contributions from the employers. *Held*, "Any benefits paid to the employee from the fund in excess of the amounts which he has contributed will constitute taxable income to him." Also held that employees may not deduct their contributions to the fund.

6. I. T. 2420, VII–2 Cum. Bull. 123 (1928).

Payment made to taxpayer for the death of her husband on the Lusitania. Payment made by the Government of Germany through the Mixed Claims Commission of the United States and Germany. *Held*, payment not income. "An award paid for the loss of a life is compensation for the loss, and as such is not embraced in the general concept of the term 'income.' In the instant case, the award is, in fact . . . to restore [the recipient] . . . to substantially the same financial and economic status as she possessed prior to the death of her husband."

7. G. C. M. 4363, VII–2 Cum. Bull. 185 (1928); I. T. 2422, VII–2 Cum. Bull. 186 (1928).

Damages for breach of contract to marry are not income. Commissioner acquiesces in 9 B. T. A. 1340 which so holds. O. D. 501, 2 Cum. Bull. 70 (1920), and I. T. 2170, IV–1 Cum. Bull. 28 (1925), which held otherwise, revoked.

8. I. T. 3194, 1938–1 Cum. Bull. 114.

Lump sum payments under § 204 (a) of the Social Security Act, 49 Stat. 620, to "aged individuals not qualified for benefits [under § 202 of the Act]" upon their reaching age 65. Payments amount to $3\frac{1}{2}\%$ of the total wages paid to the individual with respect to employment after Dec. 31, 1936, and prior to reaching 65. *Held,* payments not subject to income tax.

9. I. T. 3229, 1938–2 Cum. Bull. 136.

Lump sum death payments under the "Federal old-age benefits" provisions in §§ 203 and 204 (b) of the Social Security Act to the estates of those deceased. Amount paid equals $3\frac{1}{2}\%$ of wages earned after Dec. 31, 1936, if death occurs before 65; if death occurs after 65 amount paid is the difference between what the deceased had already been paid under the Social Security Act and $3\frac{1}{2}\%$ of his total wages after Dec. 31, 1936, or the difference between what the deceased has already been paid under the Social Security Act and what he was entitled to be paid under that Act during his life, whichever difference is higher. *Held,* citing I. T. 3194, Number 8, *supra,* that "likewise" these payments are not subject to income tax.

10. I. T. 3230, 1938–2 Cum. Bull. 136–137.

Benefit payments made "under the Federal and State plan for unemployment compensation" by a state agency during unemployment periods. The payments are made from a fund held in the Treasury of the United States, established under the Social Security Act, called the Federal Unemployment Trust Fund. Money is deposited in the fund by the various States under the provisions of the Social Security Act. *Held,* payments not subject to income tax.

11. I. T. 3447, 1941–1 Cum. Bull. 191.

Monthly payments from the Federal Old Age and Survivors Insurance Trust Fund under § 202 of the Social Security Act, as amended, 53 Stat. 1360. *Held,* payments not subject to income tax.

12. Special Ruling, May 11, 1952, 1952–5 CCH Fed. Tax Rep. ¶ 6196.

Ruling was asked with regard to (1) whether money paid by the Red Cross as disaster relief "will affect the

deductibility of losses sustained by the taxpayer in the casualty," and (2) whether disaster relief in the form of food, clothing, medical supplies, etc., will affect "the loss deduction [for casualty losses provided by the Code]." *Held,* amounts received "from the American Red Cross by a disaster victim in the form of cash or property for the purpose of restoring or rehabilitating property of the victim which was lost or damaged in the casualty should be applied to reduce the amount of the deductible loss sustained by the taxpayer," but "[f]ood, medical supplies, and other forms of subsistence received by the taxpayer which are not replacements of lost property do not reduce the amount of any loss deduction to which he is otherwise entitled nor do they represent taxable income to him."

13. Rev. Rul. 131, 1953–2 Cum. Bull. 112.

Payments "for purposes of rehabilitation not actually compensated for by insurance or other sources" by a corporation to employees and their families who were injured or sustained damages as a result of a tornado. The size of the payments did not depend upon the length of service of the employee or the nature of his employment, and the ruling states that the payments were "not related to services rendered." *Held,* payments not taxable income. "Such contributions, measured solely by need, are considered gratuitous and spontaneous. The objective of the corporation is to try to place the employees in the same economic position, or as near to it as possible, which they had before the casualty."

14. Rev. Rul. 54–19, 1954–1 Cum. Bull. 179.

Monetary recovery by decedent's estate for death under state Wrongful Death statute. *Held,* recovery not taxable as income either to decedent's estate or to those who eventually receive the proceeds. "Proceeds of this

nature, that is, compensation for loss of life, are not embraced in the general concept of the term 'income,' " citing I. T. 2420, Number 6, *supra*.

15. Rev. Rul. 54–190, 1954–1 Cum. Bull. 46.

Pension payments to employees from a fund administered by a union. Fund financed by compulsory employee contributions, based on earnings. It is not stated whether or how the benefits varied. Benefits payable only after age 60 to employees unable to keep their jobs and unable to get other regular employment because of age or disability. Benefits suspended when employee's wages reach a certain level. *Held,* payments subject to income tax. Since they are "directly attributable" to employment they are not without consideration and not gifts, "[a]ccordingly" they are income.

16. Rev. Rul. 55–132, 1955–1 Cum. Bull. 213.

Payments under the War Claims Act of 1948, 62 Stat. 1240, made by the United States to a former prisoner of war on account of an enemy government's violation of its obligation to furnish him humane treatment while held prisoner. *Held,* payments not subject to income tax because "in the nature of reimbursement for the loss of personal rights."

17. Rev. Rul. 55–652, 1955–2 Cum. Bull. 21.

Unemployment compensation payments made to federal employees pursuant to the Social Security Act, as amended, 68 Stat. 1130. Payments in amounts to equal payments employees would receive if covered by state unemployment compensation laws in States where employed and subject to the same conditions as such state payments would be. Payments made either by State, acting as agent of the United States, or by the Secretary of Labor. *Held,* payments not subject to income tax, relying on I. T. 3230, Number 10, *supra* (relating to state

unemployment payments out of federally administered fund under the Social Security Act). The principle applied there considered equally applicable here.

18. Rev. Rul. 56–135, 1956–1 Cum. Bull. 56.

"Social security benefits" paid by the Republic of Panama under Panama law to United States citizens living and working in Panama. *Held,* not subject to income tax. "Such benefits are deemed to be basically similar to the sundry insurance benefit payments made to individuals under the United States social security system which are described and held to be nontaxable to the recipients in I. T. 3447 [Number 11, *supra*]."

19. Rev. Rul. 56–249, 1956–1 Cum. Bull. 488.

Payments to unemployed workers at M. Co. made from fund to which only M. Co. contributes. Payments supplement state unemployment benefits, and are only paid to employees eligible for state benefits. Payments are such that in combination with state benefits they give employee a certain percentage of his salary while laid off, which percentage depends on marital status, number of dependents and wage rate when laid off. Length of payment period depends on size of fund. *Held,* subject to income tax.

20. Rev. Rul. 56–518, 1956–2 Cum. Bull. 25.

Payments made by German Government to persons persecuted by Nazi German Government who suffered damage to "life, body, health, liberty, rights of property ownership, or to professional or economic advancement." *Held,* because the payments are "in the nature of reimbursement of the deprivation of civil or personal rights," where they are on account of property taken away they are not income so long as they are less than taxpayer's basis in the property. Where payments are greater than

basis they may or may not be income depending on the circumstances of the case. No ruling made with regard to payments not on account of property taken away.

21. Rev. Rul. 57–1, 1957–1 Cum. Bull. 15.

Strike benefit payments made on the basis of need to strikers without regard to union membership. *Held,* taxable. Payments are not gratuitous because for the union's purposes. No conflict with I. T. 3230 (Number 10, *supra,* relating to state unemployment payments under Federal Fund), or I. T. 3447 (Number 11, *supra,* relating to Federal Social Security Insurance payments), because "[t]he benefits in these cases were held not to constitute taxable income because it was believed that Congress intended that such benefits be not subject to tax," and there is no evidence of such intent here. No conflict seen with Rev. Rul. 131 (Number 13, *supra*), relating to corporation's payments to rehabilitate employees after tornado, because payments there were gratuitous and donative. Rev. Rul. 54–190 (Number 15, *supra*), relating to pension payments from a union fund financed by dues, relied upon.

22. Rev. Rul. 57–102, 1957–1 Cum. Bull. 26.

Payment to a blind person under the Public Assistance Law of Pennsylvania, for the purpose of "providing for and regulating assistance to certain classes of persons requiring relief." The law authorizes the State "to cooperate with, and to accept and disburse money received from, the United States Government for assistance to such persons." *Held,* payments not taxable as income for they constitute "a disbursement from a general welfare fund in the interest of the general public."

23. T. D. 6272, § 1.61–11 (b), 1957–2 Cum. Bull. 18, 30.

"Pensions and retirement allowance paid either by the Government or by private persons constitute gross income unless excluded by law. . . ."

". . . Amounts received as pensions or annuities under the Social Security Act or the Railroad Retirement Act are excluded from gross income."

24. Rev. Rul. 57–383, 1957–2 Cum. Bull. 44.

Payments to unemployed workers from union unemployment fund financed through dues. Plan similar to insurance, employee choosing beforehand the class of benefits desired, and paying dues accordingly. *Held*, taxable.

25. Rev. Rul. 59–5, 1959–1 Cum. Bull. 12.

Benefit payments from "private" unemployment fund financed by dues from members. Dues vary with class of benefits desired. *Held*, payments are income to the extent that they exceed the contributions to the fund of the recipient. "In the absence of any provision in the Code which expressly excludes unemployment benefits derived from private sources from Federal income taxation, the rationale of the above-cited case [*Commissioner* v. *Glenshaw Glass Co.*, 348 U. S. 426] and Revenue Ruling [Rev. Rul. 57–383, Number 24, *supra*, relating to unemployment benefits from union fund financed through dues] is applicable." "[E]ach member must contribute to the fund an amount in relation to the benefits which he desires ultimately to receive. Therefore, the benefits, when received, do not constitute amounts gratuitously paid or received so as to be considered gifts." Citing Rev. Rul. 54–190 (Number 15, *supra*, relating to pension payments from union fund financed by dues).

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of my Brother BRENNAN, my view of the merits is so divergent from the rest that a word of explanation is needed. *Bogardus* v. *Commissioner*, 302 U. S. 34, 41, in holding payments by stock-

holders to employees were, on the facts there present, gifts, said:

> "There is entirely lacking the constraining force of any moral or legal duty as well as the incentive of anticipated benefit of any kind beyond the satisfaction which flows from the performance of a generous act."

Had a motion for a directed verdict been made by respondent at the close of the evidence, I think with all deference that it should have been granted, since my idea of a "gift" within the meaning of the Internal Revenue Code is a much broader concept than that of my Brethren. As the opinion of the Court points out, this striker (who became a union member without solicitation several months after he began receiving benefits) had no legal or moral duty to picket or to do any other act in furtherance of the strike. There is no evidence that the union made these payments to keep this striker in line. It is said that these strike payments serve the union's cause in promoting the strike. Yet the whole setting of the case indicates to me these payments were welfare, plain and simple. Unions, like employers, may have charitable impulses and incentives. Here only the needy got the relief.* Yet since

---

*An administrative letter from the national union to the local unions dated March 6, 1952, states in part:

"The handling of the emergency health and welfare problems of our members and their families is one of the most important tasks facing our Union during strike periods. We should do everything possible to minimize the hardship of our members and their families during strike periods by using the resources of the community and our Union.

"The International Union, UAW–CIO, has established a Community Services Program in order to assist our members in making full use of community services. These health and welfare agencies have been organized in the community to render services, including financial assistance, medical, hospital and nursing care, legal aid, unemployment compensation (in New York State), family and child

(so far as the present record shows) respondent acquiesced in the submission to the jury, the United States received more favored consideration than it could claim as of right.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE HARLAN and MR. JUSTICE STEWART join, dissenting.

The question here is whether, in the light of the rule adopted by the Court today in *Commissioner* v. *Duber-*

---

care and other such services. These services can be used by our members during strike periods as well as in lay-off periods. Our members support and pay for such services through taxes for Federal, state and local public agencies and through contributions for voluntary community agencies.

. . . . .

". . . Emergency strike assistance may be given to strikers who cannot meet their minimum needs with their own individual resources, who cannot qualify for such assistance from community agencies. Local Unions requiring strike assistance from the International Union must make their application for assistance to their Regional Director."

The parties stipulated to the following:

". . . The International Union grants strike benefits to non-members of the Union, who participate in a strike, if they do not have sufficient income to purchase food or to meet an emergency situation. The Union treats such non-members on the same basis as members of the Union, but non-members as well as members must be strikers before they may receive assistance from the Union.

"In order to obtain strike benefits from the Union, each applicant must appear before a Union Counsellor who asks him a series of questions which are contained on a printed Counselling form.

. . . . .

". . . The Union makes a distinction between applicants in granting strike benefits to them, depending on their marital status and number of dependents. At the time the Kohler strike aid program began, a single person received a food voucher for $6.00 per week; a married couple without dependents received a food voucher for $10.00 a week; a married couple with two children, a food voucher for $13.85 a week. On June 28, 1954, the Union increased the amount of aid to the people on the Kohler strike: aid for a single person was increased to $7.50 a week; for a married couple without dependents aid was increased to $15.00 a week; aid for a married couple with one child was increased to $18.00 a week."

*stein, ante,* p. 278, there is a reasonable basis in the evidence to support the jury's conclusion that the strike benefits paid to respondent by the union were nontaxable "gifts," within the meaning of § 102 (a) of the 1954 Internal Revenue Code.[1]

With deference, I am convinced that there was not, and that, to the contrary, the evidence compels the conclusion, as a matter of law, that those strike benefits were not "gifts" within the meaning of § 102 (a), as construed by the Court in the *Duberstein* case.[2]

The International Union is a private labor organization serving as the certified bargaining agent and representative of numerous collective bargaining units of employees. One of its principal purposes, as stated in its constitution, is to call, or approve the call by its local unions, of strikes to obtain better wages, hours and working conditions for those employees, and, of course, to win such strikes. To that end, its constitution provides for the creation of a Strike Fund, out of the dues of its members, for use in assisting its local unions in waging and winning such strikes, and it has actually created and maintains such

---

[1] Section 102 (a) provides: "Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance." 26 U. S. C. § 102 (a).

[2] Although the plurality opinion apparently considers it unnecessary to decide whether the strike benefits received by respondent constitute "income," and deals only with the question whether they were excludable "gifts," I think it is clear that those payments were "income." Strike benefits constitute realized *gains* to their recipients, as a partial substitute for lost wages rather than lost capital, and are materially different in nature from the various categories of realized gains which have been treated as nontaxable through administrative fiat. (See the Treasury Rulings detailed in Mr. Justice Frankfurter's concurring opinion.) Strike benefits are, therefore, within the reach of the "gross income" provision of the Code. See *Commissioner* v. *Glenshaw Glass Co.,* 348 U. S. 426, 429–430.

a strike fund.[3] Article 12, § 15 of its constitution further provides that:

> "If and when a strike has been approved by the International Executive Board, it shall be the duty of the International Executive Board to render all financial assistance to the members on strike consistent with the resources and responsibilities of the International Union."

Thus there is a clear and specific undertaking by the International Union to furnish assistance to its striking members when, as here, it has approved the strike, and the union has created and maintains a fund for that purpose.

Although the mentioned provisions of the International's constitution relate to financial assistance to union *members,* it was stipulated at the trial that:

> "The International Union grants strike benefits to non-members of the Union, who participate in a strike, if they do not have sufficient income to purchase food or to meet an emergency situation. The Union treats such non-members on the same basis as members of the Union, but non-members as well as members *must be strikers before they may receive assistance from the Union."* (Emphasis added.)

---

[3] The evidence shows an administrative letter was written by the International to its locals describing the nature and purpose of its strike fund as follows:

"The International Union, UAW–CIO, has also established a Strike Fund to further assist Local Unions in winning current strikes and to build a fund to protect our members in any future strikes. The Strike Fund of the International Union, UAW–CIO, is not large enough to provide strike assistance on the basis of right, and is not sufficient to meet all of the needs of our members during strike periods."

It was further stipulated that respondent, who was not a member of the union during the early months of the strike, "received from the International Union" strike benefits totaling $565.54 during the taxable year 1954.[4]

It is now established that objective intention of the transferor determines whether transfers constitute "gifts," within the meaning of § 102 (a). *Bogardus* v. *Commissioner,* 302 U. S. 34; *Commissioner* v. *Duberstein, ante,* p. 278. In *Duberstein,* the Court, in attempting to shed additional light on the factors determinative of whether requisite donative intent impelled the transfer, said:

> "This Court has indicated that a voluntary executed transfer of his property by one to another, without any consideration or compensation therefor, though a common-law gift, is not necessarily a 'gift' within the meaning of the statute. . . . And, importantly, if the payment proceeds primarily from 'the constraining force of any moral or legal duty,' or from 'the incentive of anticipated benefit' of an economic nature . . . it is not a gift. . . . A gift in the statutory sense, on the other hand, proceeds from a 'detached and disinterested generosity,' . . . ; 'out of affection, respect, admiration, charity or like impulses.' . . ." *Commissioner* v. *Duberstein, ante,* at p. 285.

I find nothing in this record to indicate that the strike benefit payments by the union to respondent and other striking workers, while they were waging the strike, were made out of any "detached and disinterested generosity,"

---

[4] While the Court of Appeals emphasized respondent's status as a nonmember when he began receiving strike benefits from the union, the parties' stipulation nullifies any possible basis for distinguishing between members and nonmembers in deciding the question before us, and, indeed, the Court does not purport to rest its decision on any such distinction.

or "out of affection, respect, admiration, charity or like impulses." To the contrary, it seems plain enough that those payments were made by the union to enable and encourage respondent and other striking workers to continue the strike which had been called or approved by the union, and were not motivated by benevolence. Those payments were therefore made in furtherance of one of the union's principal economic objectives—the winning of the strike—and hence proceeded primarily from " 'the incentive of anticipated benefit' of an economic nature" to the union, and from "the constraining force" of the union's promise to assist striking workers in winning the strike. *Duberstein, ante,* p. 285. Because of the economic advantages to be obtained by the union from winning the strike, the union had a manifest self-interest in financially sustaining the strikers while they carried on its strike. This shows, as a matter of law, that the payments were not made with the donative intent required to constitute "gifts" within the meaning of § 102 (a) and of the *Bogardus* and *Duberstein* cases. Wholly apart from the immediate objective which the union sought to achieve by paying these strike benefits, they could qualify as "gifts," as the Court recognizes, only if they were made, as said in *Duberstein,* with a " 'detached and disinterested generosity,' " and this record shows that it was principally private business purposes, not detached and disinterested generosity, that prompted the union to make the payments in question.

To be sure, the International's Secretary-Treasurer expressed his conclusion at the trial that, in the course of this strike, the International carried out the "same function" as would a local welfare agency in furnishing assistance to needy persons. But it is important to distinguish the very different factors that impelled the union from those that motivate a local welfare agency in furnishing such assistance. The union made payments only to

strikers to sustain them while they carried on the strike, whereas, a welfare agency assists the needy solely from humanitarian impulses, without purpose to obtain any benefit for itself, and whether the needy recipients are strikers or not. Public welfare payments represent the charitable response of the community to relieve hardships arising from conditions beyond its control; but the strike benefits shown by this record were designed, principally at least, for the purpose of sustaining the strikers while they carried on the union's strike to victorious end. The motivation of a public welfare agency in supplying basic needs to the unemployed is purely charitable in nature, but payments by a private union to striking workers to enable them to continue to successful conclusion a strike called or approved by the union, cannot reasonably be said to have proceeded primarily from any such charitable impulse.[5]

This conclusion is fortified by the consistent and long-standing rulings of the Treasury Department. It has twice ruled that strike benefits do not constitute non-taxable "gifts" to the recipient. In 1920 it held that:

> "Benefits received from a labor union by an individual member while on strike are to be included in his gross income for the year during which received,

---

[5] That voluntary payments by a union may be and often are made with the requisite donative intent is not to be doubted. This was illustrated by the testimony of two union officials at the trial of this case. The Secretary-Treasurer testified about expenditures from the union's strike fund to assist in emergencies caused by a tornado at Flint, Michigan, and by a flood in Connecticut. A regional officer testified that the union purchased furniture for a member whose home and its furnishings had burned, viewing that action, somewhat differently than these strike benefits, as an "outright donation" by the union. But plainly such were not the generous and charitable impulses that impelled the union to pay the strike benefits to respondent and other strikers to sustain them while they waged the union's Kohler strike.

*there being no provision of law exempting such income from taxation."* O. D. 552, 2 Cum. Bull. 73 (1920). (Emphasis added.)

And again in 1957, it ruled:

"Strike benefit payments are included within the broad definition of gross income and *do not fall within any of the exclusions provided for in the Code, including the exclusions for gifts under section 102.* They are paid only upon the event of a strike which is a means employed by the union and its members for securing economic benefits, and, for this reason, they do not constitute amounts gratuitously paid or received.

. . . . .

"Accordingly, the strike benefit payments received under these circumstances *do not constitute gifts* but constitute income and are includible in the gross income of the recipients even though distributed on the basis of their need and regardless of whether the recipients are members or nonmembers of the union." Rev. Rul. 57–1, 1957–1 Cum. Bull. 15, 16–17. (Emphasis added.)

Nor do I find in this record any "special circumstances" which might support the jury's conclusion that the payments made to respondent were "gifts." The record shows that it was the union's policy at the time of this strike to require strikers to avail themselves of any assistance offered by local community agencies before seeking assistance from the union. However, the union decided to waive this requirement with regard to the strike involved here, for the reasons given by the International's Secretary-Treasurer:

"In this particular case, the community assistance available in Sheboygan County was so small, and so

much red tape involved in obtaining it, we decided that Kohler workers would not have to seek assistance from the community agencies."

. . . . .

"The policy in 1954 was to use community agencies but, as I testified previously, that in the case of the Kohler workers we waived that particular policy because, after checking with the Sheboygan Welfare Agency, we found that the Kohler workers were expected to give up their license plates and not use their automobiles, and restrictions were so great that we didn't think we ought to impose those restrictions on the Kohler workers."

This determination was further evidence that the union's purpose in making the payments to respondent and other strikers was a business one, not proceeding from any " 'detached and disinterested generosity' " nor " 'out of affection, respect, admiration, charity or like impulses,' " *Duberstein, ante,* p. 285, but proceeding, rather, from the union's business purpose to obviate the supposed oppression of the local welfare restrictions upon the strikers, and thereby more effectively to preserve and continue the strike. It corroborates, I think unmistakably, the union's business purpose in paying the strike benefits, and shows that no genuine charitable or donative intent was involved.

For these reasons I would reverse the judgment of the Court of Appeals and hold that the payments in question were not "gifts" but were "income" and taxable as a matter of law.