**FARMERS' AND MERCHANTS' BANK,**
**a corporation, Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 70–27–F.**

United States District Court,
N. D. West Virginia,
Fairmont Division.

April 24, 1972.

Thomas N. Chambers, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., Benjamin G. Reeder, Reeder & Shuman, Morgantown, W. Va., for plaintiff.

Paul C. Camilletti, U. S. Atty., Wheeling, W. Va., for defendant.

CHRISTIE, District Judge:

Plaintiff, Farmers' and Merchants' Bank, a West Virginia corporation, instituted this suit for the purpose of securing a refund of corporate federal in-

come tax in the amount of $36,421.20, an amount which plaintiff asserts was erroneously collected by the District Director of Internal Revenue for the District of West Virginia for the year 1964. Jurisdiction of this action is based upon § 1346(a) (1) of the Internal Revenue Code, 28 U.S.C. § 1346(a) (1). The case has been submitted to the Court for decision upon the pleadings and stipulation of fact entered into between the parties and the exhibits attached thereto.

## FINDINGS OF FACT

The facts involved in this controversy are not in dispute and have been set forth at length by the parties in their stipulation. These facts may be summarized, insofar as they bear upon the determination of the issues in this case, as follows:

The dispute between plaintiff and the Internal Revenue Service concerns the deductibility of an addition to a reserve for bad debts for the year 1964. To understand this transaction, a review of the provisions of the Internal Revenue Code concerned with the deductibility of bad debts is necessary. Section 166(a) of the Internal Revenue Code, 26 U.S.C. § 166(a), provides that a business, including banking, may deduct worthless debts from gross income for the purposes of its federal income tax. As an alternative method of adjusting gross income to reflect bad debt losses, Congress has provided that "in lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts." 26 U.S.C. § 166(c).

Prior to the year 1948, plaintiff used the specific charge-off method for determining its bad debt deductions; however, in 1948 it requested, and received, permission to change from the specific charge-off method to the reserve method. The procedure, in the case of banks, for determining allowable deductions

for bad debts pursuant to the reserve method is governed by a formula prescribed by the Secretary of the Treasury and published as Mimeograph 6209, Cum.Bull. 1947–2, 26, as modified for the taxable years beginning after December 31, 1953, by Rev.Rul. 54–148, Cum.Bull. 1954–1, 60.

The formula prescribed by the Secretary for computing the annual addition to the reserve for bad debts involved the application of an average loss experience factor for the determination of the ratio of losses to outstanding loans for the taxable year. This average experience factor was determined by the ratio of losses to eligible loans outstanding for any twenty consecutive years of experience after 1927, with the total reserve for the tax year limited to three times the average experience factor applied to eligible loans outstanding at the end of the taxable year. Plaintiff's average experience factor for 1964 was based upon the ratio of its loans to eligible loans outstanding for the 20-year period from 1928 through 1947, and, based upon this calculation, plaintiff's loss experience factor used for 1964 was 2.0234 percent. Plaintiff's maximum allowable addition to its reserve, based upon the loss experience factor of 2.0234 percent, was determined to be $61,066.91, and plaintiff deducted this amount from its gross income in order to arrive at its 1964 taxable income. In computing its 1964 addition to bad debt reserve, plaintiff eliminated from eligible loans outstanding on December 31, 1964, a loan in the amount of $1,200,000.00 made to the Mellon National Bank and Trust Company, Pittsburgh, Pennsylvania. The present litigation is concerned with the question of whether or not plaintiff should now be entitled to include this loan in its eligible loans outstanding as of December 31, 1964, and thus be entitled to a larger deduction for additions to bad debt reserve for that year. In order to determine this issue, an understanding of the nature and circumstances of this and other similar loans to Mellon Bank is necessary.

In March 1964, officials of Mellon National Bank and Trust Company outlined a loan procedure to the officials of plaintiff, known in banking circles as "Federal funds sold," which is a term used to describe a loan from one bank to another which is collaterally secured by United States Government securities owned by the borrower. These loans are normally of short duration, lasting from one to three days in most cases. The usual purpose of the transaction, in the case of the borrower, is to meet reserve requirements and, in the case of the lender, is to loan excess reserve funds. The transaction may be consummated by charges and credits to the reserve accounts of the parties at the Federal Reserve Bank or by use of the funds of one party carried on deposit with the other. Plaintiff and Mellon used the latter procedure.

On April 7, 1964, the Board of Directors of plaintiff, by resolution, authorized the purchase and sale of Federal funds in multiples of $100,000.00 to Mellon. The first transaction in "Federal funds sold" by plaintiff occurred in April 1964. The amount of Federal funds loaned to Mellon during 1964 ranged to a high of $2,000,000.00 on October 6, 1964. The average daily balance of funds loaned to Mellon from April 9, 1964 to December 31, 1964 was approximately $620.488.00, and the average daily balance from October 1, 1964 through December 31, 1964 was approximately $975,000.00. On December 31, 1964, the bank had outstanding a "Federal funds sold" loan to Mellon in the amount of $1,200,000.00.

In computing its maximum 1964 addition to its bad debt reserve, plaintiff eliminated from its eligible loans outstanding on December 31, 1964, the "Federal funds sold" loan made to the Mellon National Bank and Trust Company. This "Federal funds sold" loan of $1,200,000.00 to Mellon was excluded by plaintiff solely because of its belief that such elimination was required of all banks determining additions to bad debt reserve under the formula prescribed by the Secretary of the Treasury, published in Mimeograph 6209, as modified by Rev.Rul. 54–148.

In the course of the preparation of its 1965 Federal Income Tax Return, plaintiff learned that "some banks," also computing their bad debt reserve additions under the computation methods prescribed by the Secretary of the Treasury, were treating transactions similar or identical to plaintiff's 1964 loan to Mellon as eligible in computing the maximum allowable addition to their bad debt reserve. In computing its maximum 1965 addition to bad debt reserve, plaintiff included in eligible loans outstanding on December 31, 1965, a "Federal funds sold" loan in the amount of $2,300,000.00 made to Mellon. At the March 15, 1966 meeting of the Board of Directors, it was brought to the attention of the Board that in computing its 1964 bad debt deduction, the "Federal funds sold" loan of $1,200,000.00 was not included among eligible loans. Upon being informed of this fact, the Board of Directors ordered the bad debt computation for 1964 to be recomputed to include the $1,200,000.00 "Federal funds sold" loan in eligible loans. The additional sum of $72,842.40 was ordered transferred to the bank's bad debt reserve, and the filing of a claim for refund of 1964 federal income tax was authorized. Pursuant to this direction of the Board, plaintiff had transferred from undivided profits to a reserve for bad debts the sum of $72,842.40 by an entry on its books dated March 15, 1966, wherein it was noted that the change was "to correct bad debt res. balance as of December 31, 1964 by order of Board of Directors dated 3/15/66." On April 9, 1966, the plaintiff filed the claim for refund of 1964 income tax, which is the subject of this litigation.

The next event of significance to this litigation occurred in 1968, when the Internal Revenue Service published Rev. Rul. 68–630, Cum.Bull. 1968–2, 84. The stated purpose of this ruling was to "clarify certain questions regarding the

eligibility of items for inclusion in the loan base by banks using the uniform reserve ratio method of computing annual additions to reserves for bad debts." In Section 8 of this ruling, the Commissioner stated that "Federal funds sold" were not eligible for inclusion in the loan base upon which allowable deductions or additions to a reserve for bad debts are computed. In Section 10 of this ruling, the Commissioner made the following statement with respect to the retroactivity of the ruling:

> "The position stated in this Revenue Ruling clarifies certain questions that have arisen concerning computation of the loan base but does not represent a change in a previously published position of the Internal Revenue Service. It would, therefore, normally be applied to all open taxable years. However, in view of the nature of the deduction for additions to a reserve for bad debts, over-all tax deductions to taxpayers here involved would not be significantly affected by the timing of the application of this Revenue Ruling. Therefore, under the authority of section 7805(b) of the Code, the position stated herein will not be applied by the Service to deductions claimed for taxable years ending on or before November 30, 1968, to the extent that such deductions were based on inclusion of the following items in the loan base:

> .    .    .    .    .    .

> "(4) 'Sales' or 'loans' of Federal funds. See section 8."

Subsequently, by letter dated January 27, 1969, the District Director of Internal Revenue, Parkersburg, West Virginia, transmitted to plaintiff a copy of an examination report regarding plaintiff's 1964 and 1965 Federal Income Tax Return. This examination report denied plaintiff's claim for refund of 1964 federal income taxes in the amount of $36,421.20. The disallowance was based

upon Revenue Ruling 68–630. By letter dated March 25, 1969, the refund claim for income taxes paid in 1964 was formally denied. Thereafter, plaintiff instituted the present action.

## APPLICABLE LEGAL PRINCIPLES

Plaintiff does not assert that its federal fund loans to Mellon Bank in 1964 qualify as "eligible loans outstanding" under the formula for computing additions to reserves for bad debts promulgated by the Secretary in Mimeograph 6209. Indeed, plaintiff apparently concedes that these loans did not qualify for inclusion under the Commissioner's rulings in effect in 1964, and thus, absent other factors, would not be included in eligible loans outstanding. Instead, plaintiff asserts that the Secretary has in fact applied Revenue Ruling 68–630 retroactively as to some taxpayers and prospectively as to other taxpayers within the same class without any rational foundation for the distinction. Based upon this analysis, it is plaintiff's contention that the Secretary has abused the discretion granted him by Section 7805(b) of the Code, 26 U.S.C. § 7805(b),[1] and has unjustly discriminated among the members of the class to which plaintiff belongs, i. e., banks, with respect to permission to include Federal funds in eligible loans outstanding. Based upon this alleged abuse of discretion and discrimination, plaintiff asserts that it is entitled to a tax refund for the year 1964 despite the fact that the federal fund loans do not qualify as eligible loans outstanding at the close of that taxable year.

Plaintiff's theory finds support in the concurring opinion of Mr. Justice Frankfurter in United States v. Kaiser, 363 U.S. 299, 308, 80 S.Ct. 1204, 1210, 4 L.Ed.2d 1233 (1960), in which the Justice stated:

> "The Commissioner cannot tax one and not tax another without some ra-

---

1. Section 7805(b) provides that, "The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect."

tional basis for the difference. And so, assuming the correctness of the principle of 'equality,' it can be an independent ground of decision that the Commissioner has been inconsistent, without much concern for whether we should hold as an original matter that the position the Commissioner now seeks to sustain is wrong."

Based upon this principle of "equality" the Courts, in instances in which the facts justified it, have ruled against the Commissioner, not on the basis that a reasonable interpretation of the statute involved relieved the taxpayer of responsibility for the tax, but that in certain circumstances the Commissioner is bound by prior, relevant rulings favoring the taxpayer's position. Mr. Justice Frankfurter, in his concurring opinion in the *Kaiser* case, made a further observation with regard to the equality principle, which observation also has a bearing on the issues in this case and is as follows:

"If I am right about the justification for asking this Court in this case to bind the Commissioner to former relevant rulings, with indifference to the correctness of his present position as an independent matter, the appropriate inquiry is not, 'Can such and such a principle be drawn from the administrative rulings?' The right question is, 'Is there any rational basis for the prior rulings which does not apply to the present case?' For only if there is no such rational basis can the Commissioner be said to be denying 'equal' treatment."

The cases which have applied the principle of equality articulated by Mr. Justice Frankfurter, and upon which plaintiff places its principal reliance, thus require close examination in order to determine whether that principle, as applied and explained by the Courts, governs the determination of the issues in this case and requires a decision in favor of the plaintiff.

In a Court of Claims case, Connecticut Railway and Lighting Company v. United States, 142 F.Supp. 907, 135 Ct.Cl. 650 (1956), the plaintiff brought suit to recover an alleged overpayment of income and excess profit taxes. In 1906, the plaintiff leased certain gas and electric property to the Consolidated Railway Company for a term of 999 years. In the lease, the lessee covenanted to pay all of the taxes which might be imposed on the lessor in relation to the leased property. In a subsequent modification of the lease dated December 30, 1943, it was provided that the lessee would be liable to reimburse the lessor for income and excess profit taxes. For each of the years involved in the suit, the plaintiff accrued against the lessee the amount of the income and excess profit taxes paid by the plaintiff and reimbursable by the lessee according to their agreement. These amounts were collected from the lessee in the years following their payment by the plaintiff. In its tax returns, the plaintiff listed as "rents" both the amounts received as rents under the lease and the amounts reimbursed to it by the lessee for taxes and for the taxes on those taxes. In its opinion, the Court gave the following illustration of these transactions between the lessor and the lessee:

"A leases property to B for an annual rent of $10,000, B agreeing also to reimburse A for taxes paid by A on account of the lease. The tax rate is a flat 40 percent. A lists on his tax return the $10,000 rent. The tax on that is $4,000, which is reimbursable to him, so he also lists that as rent. The tax on the $4,000 is $1,600, which is reimbursable to him, so he also lists that as rent, and pays a tax of $640 on it."

Connecticut Railway and Lighting Company instituted the suit before the Court of Claims for recovery of payments made by it corresponding to the $640 in the illustration. The Court agreed with the government that the reimbursement for taxes paid was income; however, the Court noted that the government in Old Colony Trust Company v. Commissioner of Internal Revenue, 279 U.S. 716, 49 S.

Ct. 499, 73 L.Ed. 918 (1929), stated in its brief on reargument before the Supreme Court that,

"It is true that in earlier years there was a lack of uniformity in treatment and that in some cases the amount of *additional taxes* paid by another was in turn added to the taxpayer's income. Since 1923, however, the practice has been settled and the Treasury Department has added only the *original* tax paid by another, and abandoned any attempt to treat the *additional* tax as additional income."

The Supreme Court, during the course of the opinion in the *Old Colony* case, noted the government's statement with regard to the policy of the Treasury Department.

On March 12, 1952, the Commissioner of Internal Revenue issued Mimeograph 6779 which provided that all federal taxes paid to, for, or on behalf of a landlord by a tenant must be included in the taxable income of the landlord. By a subsequent ruling dated October 14, 1952, the Commissioner stated that the ruling with respect to such taxes would not be applied for taxable years beginning prior to January 1, 1952, "except that any Federal income or excess profit taxes which have been paid on account of the inclusion in gross income of the taxes paid by the payor will not be refunded." The plaintiff had paid the taxes prior to the 1952 ruling and was seeking a refund, basing his argument in part upon the assertion that the 1952 rulings discriminated without justification between taxpayers who had paid their taxes and those who had not. The Court found in favor of the plaintiff, holding that in fact there had been an unjust discrimination and that this unjust discrimination resulted in part, at least, from the published position of the Commissioner. The Court stated that, "We think that the law in action can not be so divorced from the law in the books as to make the latter applicable only to an occasional unfortunate who happened to pay his taxes on the basis of the law in the books."

In City Loan and Savings Company v. United States, 177 F.Supp. 843 (N.D. Ohio 1959), aff'd. 6th Cir., 287 F.2d 612, the taxpayer brought suit to recover excess profit taxes paid. Plaintiff was engaged in the personal loan and finance business in the State of Ohio and, for a period of fourteen years, had treated its certificates of deposit as borrowed capital under the applicable provisions of the Excess Profits Tax Act of 1939 and 1950. In a Tax Court decision in 1945, the Tax Court had found that certificates of deposits qualified as borrowed capital and the Commissioner had taken no appeal on that decision. Subsequent to the 1945 decision of the Tax Court, the Commissioner acquiesced in the decision and announced such acquiescence to the general public. The years during which the plaintiff sought a refund of excess profit taxes were 1951 and 1952, years during which the Commissioner's acquiescence was in effect. On March 23, 1959, the Commissioner of Internal Revenue announced his non-acquiescence in the decision of the Tax Court relating to the treatment of certificates of deposits. Based upon the foregoing facts, as well as the additional fact that the only other building and loan company in Ohio was permitted by the Commissioner to treat its certificates of deposits as borrowed capital during the years in question, the Court found an abuse of discretion within the meaning of Section 7805(b), as well as unjust discrimination in applying the subsequent ruling to plaintiff at a time when this ruling could not be applied to the only other building and loan company in the State of Ohio. In the course of its opinion, the Court made the following statement with respect to the action by the Commissioner:

"The Commissioner of Internal Revenue either lacked power to deny, or was equitably estopped from denying, borrowed capital treatment to the funds raised by taxpayer through the issuance of certificates of deposit because the taxpayer, in good faith, had filed its federal income and excess

profits tax returns and had treated such funds as borrowed capital, in reliance upon and being lured by the acquiescence of the Commissioner of Internal Revenue in the conclusion reached in the Economy case and his official pronouncements in connection therewith (Finding of Fact No. 18), and incurred substantial prejudice in the way of large interest charges and the failure to set up reserves, directly due to the change of position of the Commissioner of Internal Revenue." With respect to the difference in treatment between plaintiff and The Economy Savings and Loan Company, the Court noted:

"The change of position by the Commissioner of Internal Revenue, first made known to taxpayer in January 1957, denying borrowed capital treatment to the funds raised by certificates of deposit issued by taxpayer to holders for the purpose of raising money to carry on its business, and his action in making an individual, retroactive and discriminatory application of such change of position to taxpayer, while allowing borrowed capital treatment to like funds of The Economy Savings & Loan Company which was identically organized, supervised and operated, constituted inequitable conduct by the Commissioner, if not an unlawful abuse of discretion within the meaning of Section 7805(b) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7805(b)."

In Exchange Parts Company of Fort Worth v. United States, 279 F.2d 251, 150 Ct.Cl. 538 (1960), plaintiff brought suit for the recovery of manufacturers' excise taxes paid by it from November 1, 1951 to December 31, 1954. Plaintiff was in the business of rebuilding parts for automobiles and other automobile equipment, mainly using items which had been junked or traded in because they were no longer operative and inserting in them such new parts or usable old parts as were necessary to make them work. As a part of its business, plaintiff rebuilt generator armatures, starter armatures, and clutch pressure plates. The plaintiff sold these rebuilt items to the wholesale trade. In 1954, after plaintiff had been paying the excise tax on its products for a number of years, it requested a ruling from the Internal Revenue Service, Excise Tax Division, as to its liability for excise taxes on its sale of generators and starters. In reply to the request for a ruling, the Chief of the Excise Tax Branch answered that there would be no tax due on the sale by any rebuilder of a rebuilt automobile generator or starter. In October 1954, the plaintiff requested a second ruling with respect to the taxability of its sales of rebuilt clutch pressure assemblies. The Chief of the Excise Branch also answered this inquiry and informed the plaintiff that the tax was not applicable to sales of used clutch pressure plate assemblies. In December 1954, the Excise Tax Branch of the Internal Revenue Service, in response to a request from a supplier of the plaintiff for rulings, advised the supplier that products similar to plaintiff's were not taxable. In 1955, the Internal Revenue Service issued another ruling to the effect that rebuilt generators, such as were produced by plaintiff, were not subject to the manufacturers' excise tax. In July 1955, plaintiff filed claims for refund of taxes paid on the products covered by these rulings. In 1956, the Internal Revenue Service issued another ruling in which it reconsidered its previous position with respect to the taxability of the reassembled generators and rebuilt clutch assemblies. As a consequence of the reassessment, the Internal Revenue Service concluded that the positions taken in the previous rulings were not sound and held that the manufacturers' excise tax would be applied to such rebuilt items. The Revenue Service stated in the ruling that since reliance may have been placed on its previous rulings, the tax would not be applied to sales occurring prior to June 1, 1956, "except that any tax which may have been paid by generator rebuilders on generators containing armatures re-

wound by them or by clutch rebuilders will not be refunded." Thereafter, the Revenue Service rejected plaintiff's claim for a refund. In finding prejudicial discrimination with regard to the application of this ruling to plaintiff, the Court made the following observations:

"We have, then, a situation in which the taxing authorities have completely reversed positions taken both in official published Revenue Rulings and in individual rulings made to the plaintiff. Since the position finally taken was probably a sounder interpretation and application of the statute than the earlier position, the earlier rulings may properly be regarded as errors of law. In Automobile Club of Michigan v. Commissioner [of Internal Revenue], 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746, the Court held that 'The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law.' . . . .

"It would seem, then, that the Commissioner had the authority to make his new ruling retroactive, or nonretroactive, as seemed to him wise.

"The Commissioner, however, made his ruling nonretroactive as to certain taxpayers and retroactive as to others, including the plaintiff. And the distinction was based solely upon whether the particular taxpayer had, or had not paid his taxes. We dealt with such an asserted basis for differentiating between taxpayers in Connecticut Railway & Lighting Co. v. United States, 142 F.Supp. 907, 135 Ct.Cl. 650, 653–654, and held that the promptly paying taxpayer could not be validly made the object of prejudicial discrimination.

"We reach the same conclusion in this case. The plaintiff is therefore entitled to recover, with interest as provided by law, the taxes paid by it, which would not have been payable under Rev.Rul. 56–189, if that ruling had not been made retroactive as to the plaintiff, and judgment to that effect will be entered for the plaintiff."

The Court of Claims in International Business Machines Corporation v. United States, 343 F.2d 914, 170 Ct.Cl. 357 (1965), again held, under the facts of that case, that the taxpayer was entitled to a refund because of what it deemed unjust discrimination on the part of the Revenue Service. IBM and Remington Rand were, in the years 1951 to 1958, the only two manufacturers of larger electronic computing systems. Prior to mid-April of 1955, both of these companies paid a 10 percent excise tax imposed on the sale or lease of "business machines." In April 1955, Remington Rand requested a ruling from the Commissioner of Internal Revenue that certain of its computing devices were not subject to this tax. On April 15, 1955, the Commissioner issued a private ruling in the form of a telegram to Remington Rand informing that company that the computing devices in fact were not subject to the excise tax. IBM, having learned of this determination, sought a similar ruling for its competing computer on July 13, 1955. IBM captioned its letter "Urgent! Please Expedite." Shortly after making this request, IBM filed a refund claim for the excise tax paid from June 1, 1951 to May 31, 1955. In September 1955, Remington filed a comparable refund claim for similar taxes paid from January 1, 1952 to April 30, 1955. In July 1956, Remington received a refund on its claim for the period from 1952 to 1955.

On May 1, 1957, the Internal Revenue Service informed Remington that it had reconsidered its previous opinion and concluded that the computing devices were taxable as business machines; however, the Revenue Service informed Remington that the 1955 ruling would be invoked prospectively and gave Remington the opportunity to protest the decision. Finally, on December 3, 1957, the Revenue Service informed Remington that it had concluded that the computer devices were taxable as business machines. This new ruling; however,

was to apply only to sales made and leases in effect "on and after the first day of the month which begins 30 days after the date of this letter." As a result of this ruling, and the refund made in July of 1956, Remington was permitted to dispose of its computers for a period of six years, beginning in January of 1952 and ending in January of 1958, without paying the excise tax.

On November 26, 1957, only a few days before the letter to Remington revoking the earlier ruling, the Revenue Service informed IBM that, after extensive study, it had decided that IBM's equipment was taxable as business machines. In April of 1958, IBM filed a second refund claim for the period from June 1, 1955 to January 31, 1958. On February 3, 1959, the Revenue Service disallowed both of IBM's refund claims, thus holding IBM liable for the excise tax for the full period of June 1951 through January 1958. In its suit before the Court of Claims, IBM did not assert that its computers were not "business machines" and, therefore, were not taxable under the applicable provisions of the Internal Revenue Code. Its position was that the Internal Revenue Service's conduct toward it, in contrast to the treatment of Remington Rand's identical machines for the same period, invalidated the excise taxes levied on the IBM equipment.

The Court of Claims, in finding that the Internal Revenue Service had abused its discretion, exercised under Section 7805(b), emphasized the fact that the Revenue Service had afforded opposite treatment to the only two competitors in the field of large electronic computing systems. Thus, in a class made up of only two taxpayers, the Revenue Service had imposed a tax upon one and relieved the other of paying the tax for the same period of time on the same type of business machines. The Court also emphasized the importance of the fact that the Internal Revenue Service had issued a favorable ruling to Remington Rand covering the identical circumstances involved in IBM's situation, that IBM had learned of this ruling, and had immediately requested a similar ruling for its products. The Court found the Revenue Service's delay in answering IBM's request inexplicable, particularly in view of the fact that a favorable ruling had already been given to Remington Rand. These facts, taken together with the disparity in treatment between the two competitors, amounting to approximately $13,000,000.00 in taxes, established, in the Court's view, an abuse of discretion with regard to the retroactive application of the 1957 ruling to IBM. The Court stated that,

"This history exposes a manifest and unjustifiable discrimination against the taxpayer. We do not say, we need not say, that the differential treatment was deliberate or malevolent. It is enough that the direct result of the Service's course-of-conduct, though inadvertent and unplanned, was to favor the other competitor so sharply that fairness called upon the Commissioner, if he could under Section 7805(b), to establish a greater measure of equality. For all tax rulings, it is important that there be like treatment to those who should be dealt with on the same basis. . . . The gap here in the imposition of the 'business machines' tax was so large that the Commissioner could not choose to ignore it if an appropriate remedy was at hand."

The Court has found it necessary to review the preceding cases in greater detail than normally would be required not only because of the plaintiff's reliance upon these precedents in seeking a refund in this case, but also because the Courts, in reaching their decisions, have not relied upon broadly drawn principles of law, but rather upon the "totality of the circumstances" involved. Bookwalter v. Brecklein, 357 F.2d 78, 84 (8th Cir. 1966). These cases demonstrate the various circumstances under which the courts have excused tax liability on the basis of action or conduct on the part of the Internal Revenue Service rather than upon the question of whether or

not the taxing statute involved required an imposition of the tax. Having reviewed these cases, as well as others cited by plaintiff in support of its position, the Court finds that the facts and circumstances of the case at bar are distinguishable from those involved in cases in which the courts have found that an estoppel, an abuse of discretion, or discriminatory conduct barred the imposition of the tax sought to be imposed by the Internal Revenue Service.

Before setting forth the differences between the facts of this case and the facts of the cases in which the courts have ruled in favor of the taxpayers, it would be helpful to enumerate certain factors which *are not* involved in the circumstances giving rise to the present litigation. Initially, it is important, in the Court's view, to note that there is no evidence in this case tending to establish that the Internal Revenue Service, either publicly or privately, has taken the position that federal fund loans are includable in the "eligible loans outstanding" base upon which additions to bad debt reserves are computed. Indeed, the Revenue Service, in Rev.Rul. 68–630, states (and there is no evidence to the contrary) that the position taken in that ruling to the effect that loans of federal funds are to be excluded from the loan base upon which additions to reserve are calculated was only a clarification of certain questions which had arisen and did "not represent a change in a previous position of the Internal Revenue Service." There is no indication in the record before the Court that the Revenue Service had ever given permission to any bank to include the federal fund loans in its calculations for additions to a reserve for bad debts. Plaintiff only asserts that in 1965, it "learned for the first time that some banks, also computing their bad debt reserve additions under the . . . formulas prescribed by the defendant, were treating transactions similar or identical to plaintiff's 1964 loan to the Mellon National Bank and Trust Company as eligible loans in computing the maximum allowable addition to their bad debt reserves." This,

of course, cannot be accepted as proof of the fact asserted.

Thus, it would appear that the Revenue Service has always taken the position that these types of loans were to be excluded from the loan base in calculating additions to bad debt reserves. At the same time the Revenue Service did recognize in Rev.Rul. 68–630 that in some instances banks had included these loans in calculating additions to bad debt reserves. In the opinion of the Revenue Service; however, because of the nature of the deduction for additions for bad debts, "over-all tax deductions to taxpayers involved would not be significantly affected by the timing of the application of this Revenue Ruling." Hence, under the authority of Section 7805(b), the Secretary exercised his discretion by stating that the position taken in the Revenue Ruling would not be applied by the Revenue Service to deductions claimed for taxable years ending on or before November 30, 1968, to the extent that such deductions included federal fund loans. Considered in this light, it is clear that there are very real and important distinctions between the facts of this case and the facts of those cases in which the court has barred the Revenue Service from imposing an otherwise valid tax.

In the *Connecticut Railway* case, the Court noted that it had been a settled practice of the Treasury Department to tax, as income, only the original tax paid by a lessee to his lessor, and the Department had abandoned any attempt to treat the additional tax payments as income. The taxing authorities publicly adopted this position and continued it until March 12, 1952, when the Commissioner issued a Mimeograph asserting that the rule had been changed and would be given prospective effect for years beginning after January 1, 1952. In the *Connecticut Railway* case, therefore, the disparate treatment accorded taxpayers was the direct result of a reversal of positions by the Internal Revenue Service. Those taxpayers who avoided the tax did so because the Revenue Service had adopted a position which

permitted the tax avoidance. As shown above, there has been no such conduct on the part of the Revenue Service with respect to its position on the eligibility of federal fund loans for inclusion in calculations toward determining the amount of additions to reserves for bad debts.

In the *City Loan and Savings Company* case, there was involved not only a reversal of the position of the Internal Revenue Service, but also a clear discrimination between the only two members of a class of taxpayers, i. e., the two building and loan associations in the State of Ohio. The class involved in the present case is a very large one, including all commercial banks in the United States. Further, there is no evidence before the Court with respect to the number of banks which have included federal fund loans in calculating additions to bad debt reserves. The only evidence of any kind giving any indication that banks have included such loans is the statement made by the plaintiff in the stipulation of facts to the effect that it learned in 1965 that *some* banks were including such loans in their calculations. The statement in Rev.Rul. 68–630 that the Revenue Service did not intend to apply the requirements of that ruling to deductions claimed for taxable years prior to November 30, 1968, is, of course, some indication that there were banks who had included federal fund loans in calculating additions to reserves. This evidence, however, falls far short of establishing any similarity to the situation which existed in the *City Loan and Savings Company* case or in the *International Business Machines Corporation* case. In each of these cases, the class of taxpayers was made up of two taxpayers and the Revenue Service found itself in the position of according opposite treatment to the two members of the class.

Finally, in the *Exchange Parts* case, the Court again was confronted with a situation in which the Internal Revenue Service "completely reversed positions" with regard to the taxability of a transaction and, pursuant to the authority of Section 7805(b), gave the most recent ruling prospective effect only. At the same time, the Commissioner refused refunds to those who had paid the tax involved. The Court found an unwarranted discrimination between those who had not paid the tax on the basis of the Commissioner's previous rulings and those who had paid such taxes, and for that reason ordered the government to refund the taxes paid. The obvious distinction between the *Exchange Parts* case and the present case is that while there may have been "some banks" who erroneously included federal fund loans in the eligible loans outstanding base, those banks did not do so with the approval of the Commission. In this case, in contrast with the situation in the *Exchange Parts* case, the Internal Revenue Service is not in the position of permitting those taxpayers who have relied on a previous, apparently erroneous, ruling to avoid the tax while at the same time according different treatment to others who have already paid the tax. The *Exchange Parts* case illustrates a situation in which disparate treatment results directly from action on the part of the Internal Revenue Service, i. e., an apparently erroneous ruling is corrected prospectively and as a consequence, some taxpayers are permitted to completely avoid the tax in question while others similarly situated are required to pay or are denied a refund of the tax. As has been demonstrated, that situation does not exist in this case, therefore, we do not feel compelled to find in favor of plaintiff on the basis of such precedent.

## SUMMARY

In summary, an exhaustive review of the cases dealing with the question of estoppel, abuse of discretion, and discrimination in taxing situations has failed to uncover any principle of law upon which plaintiff may justly claim, under the facts of this case, entitlement to a tax refund. This, however, is not surprising inasmuch as plaintiff's claim, in essence, rests upon the assertion that since "some banks" apparently have paid less tax than it, it is now entitled to a

refund. The Court finds that there are absent from the facts of this case any of the relevant factors or considerations which in other actions have necessitated a finding in favor of the taxpayer. The mere fact that some banks may have erroneously paid less corporate income tax than plaintiff, absent a showing that the situation resulted from some action on the part of the Internal Revenue Service, does not provide any basis upon which to order a refund of taxes to plaintiff in this case. The courts have ordered refunds and excused taxes otherwise due in certain factual situations. This relief has been accorded to taxpayers on the basis of: (1) an estoppel theory where there has been a reliance on the position taken by the Revenue Service to the detriment of the taxpayer, (2) where there has been an abuse of discretion in applying rulings retroactively or prospectively, when those rulings represent a change in position on the part of the Revenue Service, and (3) where there has been actual and overt discrimination by the Revenue Service between taxpayers in a given group or class without any rational basis for such discrimination. Of course, there is no basis in fact for a claim of reliance in this case since the position of the Revenue Service is and always has been, insofar as the record shows, that federal fund loans should be excluded in computing bad debt reserves. With regard to abuse of discretion and discrimination, plaintiff asserts only that "some banks" have included federal fund loans in computing bad debt reserves. The decision of the Revenue Service not to recompute the taxes of those banks with reference to taxable years prior to November 30, 1968, presents an entirely different and factually distinguishable situation from that in which the Revenue Service accords disparate treatment to the only two members of a class on the basis of differing rulings issued at different times by the Internal Revenue Service. Thus, no abuse of discretion or discrimination is established here. Judgment, therefore, will go for the defendant.