Marvin E. JENSEN et al.,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 74–1514.

United States Court of Appeals,
Fifth Circuit.

April 10, 1975.

---

Scott P. Crampton, Asst. Atty. Gen., Daniel C. Perri, Atty., Meyer Rothwacks, Chief, Appellate Sec., Tax Div., Dept. of Justice, Washington, D. C., John L. Briggs, U. S. Atty., Kendell W. Wherry, Asst. U. S. Atty., Jacksonville, Fla., Elmer J. Kelsey, Donald H. Olson, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Marvin E. Jensen, Margaret F. Jensen, pro se.

Before TUTTLE, WISDOM and GOLDBERG, Circuit Judges.

WISDOM, Circuit Judge:

In this refund suit Marvin Jensen seeks to recover $1,400 in income taxes he allegedly overpaid for 1968, 1969, and 1970. The controversy turns on whether payments made by Graybar Electric Company to the estate of its deceased employee, Mrs. Marguerite Jensen, wife of the complainant, on the redemption of Graybar stock held by her estate, constitute taxable income or nontaxable gifts.

Mrs. Jensen had been employed for Graybar for twenty-five years. In 1944, at the age of fifty, she retired as secretary to Graybar's president and chairman of the board. During her employment she had participated in the company's stock purchase plan and, at the time of her death in 1967, owned 1,308 shares of Graybar stock. A stock dividend of 327 shares, paid some three weeks after her death, increased to 1,635 the number of shares held by her estate. One year after her death, the company exercised its option to redeem those shares at par: $20 per share. In addition to that re-

demption price, Graybar made payments to the estate, under its "Special Death Benefits Plan", of $4,087.50 for each of the years in suit: 1968, 1969, and 1970. The tax treatment of these additional payments is the focus of this controversy.

Jensen reported the payments as long-term capital gains. He now asserts that they were nontaxable gifts and that he is, accordingly, entitled to a refund. The government takes the position that they were payments with respect to redeemed stock and were properly reported and taxed as long-term capital gain. The district court agreed with the taxpayer. We reverse.

The pertinent facts were stipulated. Graybar, since 1928, has encouraged its employees to purchase shares in the company through stock purchase plans. Only employees of Graybar have been entitled to subscribe under these plans, and, since 1939, Graybar employees have owned all the company's outstanding common stock, although not all employees are stockholders. The stock is sold subject to a restrictive agreement prohibiting sale or transfer to any party other than Graybar and reserving to Graybar the right to repurchase the employee's shares on his death.[1] All shares so sold are held by a voting trust. The amount of stock an employee is entitled to purchase varies according to his rate of compensation, length of service, and, in some instances, his position with the company. The stock is sold at par: $20 per share. On an employee's death, Graybar is entitled to repurchase his shares at par. Under the original stock purchase plan, however, the redemption price also included additional payments above the par price, to reflect any excess of fair market value over par.

In 1938 the company announced a change in policy. The board recommended that the company cease making these additional payments to reflect the excess of fair market value over par and that it pay, on redemption, only the par price.[2] This recommendation was explained in a letter to shareholders:

> The experience of the last ten years has shown that due to the extensive and rapid fluctuations in business conditions this arrangement [payment of additional amounts representing excess of fair market value over par] may work out unfairly to other stockholders. During and immediately after a period of prosperity the stock may have a substantially increased value which to a greater or lesser extent may shrink during a subsequent period of depression. This means Graybar Management and its remaining shareholders may suffer severe losses with respect to the stock purchased from pensioners and estates during or immediately following periods of prosperity.

Three years after this recommendation was adopted, Graybar's board reëxamined the company's stock purchase plan. It passed a resolution authorizing the company's officers to formulate "an amendment to the certificate of incorporation of the company and to the stock purchase plans" to provide that the company, in redeeming shares, pay "in addition to the repurchase price now provided for, additional amounts over a limited period of five years equivalent to any dividends" that would have been paid on the stock had it remained outstanding. One month later, the board again discussed "additional payments", recharacterizing them, however, as "additional death benefits." The minutes of the board meeting disclose the following discussion:

> The matter was discussed at some length. It was pointed out that this would give greater benefits to those who are stockholders than to those who were not. It was the consensus of opinion of those present that it

---

1. Since 1939, Graybar has exercised this option in every case.

2. As part of the recommended change in policy, each stockholder, in exchange for surrender of his rights to additional redemption payments, received $1 for each share of stock he held.

would be fair to pay some additional death benefits upon the death of an employee or a pensioner who as a stockholder has furnished part of the working capital of the company during his life-time and whose estate by reason of his death is compelled to surrender his stock to the company.

Accordingly, the board rescinded its earlier resolution to amend the stock purchase plan and amended, instead, the "Plan for Employees' Pensions, Disability Benefits, and Death Benefits", to include a provision for "special death benefits". The new provision empowered the board, on redeeming shares, to make payments ("special death benefits") for five years to the shareholder's estate or beneficiaries, in amounts equal to the cash dividends paid during that period on the equivalent number of outstanding shares.[3] This plan for "special death benefits" included, however, a caveat: stockholders had no right, either legal or equitable, to receive these payments, and action or inaction of the company in any one case would not constitute a prece-dent or give rise to any obligation in any other case.[4]

Despite this caveat, the company has paid "special death benefits" consistently. From 1941, the year the plan was adopted, until 1957, the company made the additional payments in 189 of 193 redemptions and, in more recent years, 1960 through 1972, in 271 of 273 redemptions. In the two cases in which the company declined to make payments, it concluded that the recipients designated by the shareholders' wills were "too remotely related."[5] In short, in carrying out its written plan, the company has followed a policy of paying additional amounts on the redemption of stock in all cases where the designated beneficiaries are not "too remotely related" to the deceased shareholder. This practice is, to all appearances, consistent with the plan as written, specifically, with the provision of the plan that grants discretion to the board to such payments either to the estate of the shareholder or "to those beneficiaries of the deceased employee or pensioner as would be enti-

---

3. Section 8—Special Death Benefits.

In the event of the Death of any employee or of any person receiving a service or disability pension under this Plan who at the time of death is a holder of shares of Common Stock of the Company which the Company shall reacquire pursuant to any option or contract, the Committee may recommend to the Board of Directors that the Board authorize payments (hereinafter called "Special Death Benefits") during a limited period of five years from the last dividend date preceding the date of the reacquisition of such shares by the Company (in addition to any payments or benefits otherwise provided for in Section 7 of the Plan) in amounts not exceeding the cash dividends, if any, that may be paid during such limited period on a number of shares of Common Stock of the Company equal to the number of such shares reacquired by the Company from the estate of such decedent. No such special death benefits shall be or become payable in any event except as such dividends are declared and paid upon the shares of the Company during such limited period and then only if and to the extent authorized by the Board of Directors pursuant to the recommendation of the Committee.

Any payments authorized pursuant to the preceding paragraph of this Section 8 shall be made to the estate of the decedent or at the option of the Committee to such beneficiaries of the deceased or pensioner as would be entitled to receive Regular Death Benefits in the event any Regular Death Benefits should be payable.   *   *   *

4. Neither the provisions of this Section 8 nor the action or inaction of the Committee or the Board of Directors as to the payment or nonpayment of a Special Death Benefit shall give rise to or create in any person any right whatsoever, either legal or equitable, against the Company, the Board of Directors, the Committee or any member thereof for the payment of any Special Death Benefit, and the action or inaction of the Committee or the Board of Directors, or both, as to the payment or nonpayment of a Special Death Benefit in any case shall not constitute a precedent or give rise to any obligation to take similar action in any other case or instance.

5. In one case, the beneficiaries under the employee's will would have been two colleges, a church, and three cousins. In the other, the recipients would have been two unrelated friends. In both cases, we infer, the potential recipients were not "such beneficiaries  .  . as would be entitled to receive Regular Death Benefits".

tled to receive Regular Death Benefits in the event any Regular Death Benefits should be payable." For at least twelve years, Graybar has not deviated from this policy.

In the early years of the plan, Graybar claimed a deduction for the benefits paid, as additional compensation for previous services. The tax court and the court of appeals agreed that the payments were "strictly attributes of stock" not deductible as post-mortem compensation. Graybar Electric Company v. Commissioner, 2 Cir. 1959, 267 F.2d 403, 404, aff'g 29 T.C. 818. Each court noted that Graybar, in addition to its plan for special death benefits, maintained for all its employees, irrespective of stockholding, a comprehensive plan of extra compensation, pensions, disability benefits, and death benefits.[6] Only under the plan for "special death benefits" is eligibility tied in any way to ownership of stock.

Mrs. Jensen's estate was one of hundreds to receive these additional payments following the redemption of their Graybar stock. The payments were made under a plan that had been in existence for twenty-six years and that continued after payment of the sums in controversy here. Nothing in the record suggests that Mr. Jensen's case is in any way distinguishable from the other cases in which these payments were made. So the question we address here is not simply the appropriate tax treatment of these particular payments but also, generally, the payments made under Graybar's special death benefits plan. Two other courts addressing this question have held in favor of the taxpayer, concluding that the "special death benefit" payments constitute nontaxable gifts. Harper v. United States, 9 Cir. 1971, 454 F.2d 222, aff'g C.D.Cal.1970, 314 F.Supp.

360; Pearson v. United States, E.D.Va., U.S.Tax Cas. (74–1, at 33,984), ¶ 9406, appeal docketed, No. 74–2040, 4 Cir., 1974. We cannot agree.

The touchstone in this area of tax law is Commissioner v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218. There the Court emphasized that "the most critical consideration" in determining whether a given transfer constitutes a gift is "the transferor's 'intention'." 363 U.S. at 286–87, 80 S.Ct. 1190. "A gift", the Court observed "proceeds from a detached and disinterested generosity, out of affection, respect, admiration, charity or like impulses." 363 U.S. at 285, 80 S.Ct. at 1197 [citations omitted]. When, on the other hand, "the payment proceeds from 'the constraining force of any moral or legal duty' or from 'the incentive of anticipated benefit' of an economic nature, it is not a gift." 363 U.S. at 285, 80 S.Ct. at 1196, 4 L.Ed.2d at 1225. In sum, the court concluded that the "nontechnical" nature of the statutory standard, its "close relationship to the data of human experience", and the variety of fact patterns in which the gift issue arises require close analysis of the factual elements present in each case. But, as Judge Friendly has observed, the Court did not mean "that every trier of facts was to be free for all future time to disregard guidelines that other trial and appellate courts had developed concerning the weight to be given to recurring 'relevant factual elements, with their various combinations.'" Estate of Carter v. Commissioner, 2 Cir. 1971, 453 F.2d 61, 64.[7] Decisional consistency, within the limitations imposed by the variability of human affairs, is as much a goal in this as in other areas of law.

---

6. The record does not show whether Mr. Jensen received "regular" as well as "special" death benefits.

7. For discussion of *Duberstein's* impact on "widow gift" cases, see Crown, Payments to Corporate Executives' Widows, N.Y.U. 19th Inst. on Fed. Tax 815 (1961); Note, Voluntary Payments to Widows of Corporate Execu-

tives: Gifts or Income?, 62 Mich.L.Rev. 1216 (1964); Note, Payments to Widows of Corporate Executives and Employees—Gifts or Income?, 49 Va.L.Rev. 74 (1963). See generally Klein, An Enigma in the Federal Income Tax: The Meaning of the Word "Gift", 48 Mich.L. Rev. 215 (1963). See also Blum, Motive, Intent and Purpose in Federal Income Taxation, 34 U.Chi.L.Rev. 485 (1967).

■ The district court here, in concluding that the "special death benefits" paid Mrs. Jensen's estate were gifts, adopted the reasoning and holding of the Ninth Circuit in *Harper*. There the court applied five factors recognized in Poyner v. Commissioner, 4 Cir. 1962, 301 F.2d 287, as pertinent tests: (1) that the payments were made to the spouse of the deceased shareholder, not to his estate; (2) that Graybar had been under no obligation to make the payments and had, in fact, decided on previous occasions not to make payments to persons qualified; (3) that the company derived no benefit of an economic nature from the payments; (4) that the recipient had never performed any services for the company; and (5) that the services of the deceased employee-shareholder had been fully compensated during his lifetime.

We have no quarrel with this analysis as it was adopted and applied in *Poyner*. We have indicated above our agreement that tests earlier developed by courts were not invalidated by *Duberstein*. And we agree that generally, and on the facts present in *Poyner*, the factors listed above are relevant in determining whether specific payments are gifts. But they are not, as the court in *Poyner* explicitly indicated, the only relevant factors. Nor are they necessarily of equal relevance when transposed to a different fact situation. Indeed, *Duberstein* makes clear that these factors, helpful though they are, are not rules susceptible of axiomatic application.

We cannot go along with the *Harper* court's application of the *Poyner* analysis. We differ, in the main, over the proper characterization of payments made under Graybar's special death benefit plan. Payment under the Graybar plan is made to the shareholder's estate, as was the case here, or directly to the designated beneficiaries. In such circumstances, especially where the employee-shareholder had a reasonable expectation that such payments would be made, we are disinclined to attribute significance to whether payment is made to the estate or to the beneficiaries.

Furthermore, whether the recipient had ever performed any services for the company and whether the services of the decedent had been fully compensated during his lifetime are factors of limited persuasiveness on the facts of this case. They are useful, no doubt, in determining whether specific ad hoc payments constitute gifts or compensation for services rendered. It was in aid of that determination that these guidelines were developed and have been applied. See Poyner v. Commissioner, 4 Cir. 1962, 301 F.2d 287; Florence S. Luntz, 1958, 29 T.C. 647; Estate of Hellstrom, 1955, 24 T.C. 916. But there is no contention here that Graybar's "special death benefits" constitute additional compensation. Thus we may concede that these factors aid in dispelling any suggestion that the payments were made as compensation, without in any way advancing the contention that they are gifts. There are pitfalls to argument by exclusion.

Moreover, the *Harper* version of the *Poyner* analysis does not weigh elements directly responsive to the facts of this case: that the payments were made under a long-established plan and practice and without consideration of the needs and circumstances of the recipients. Finally, we cannot accept the finding that Graybar derived no benefit from these payments and was under no moral obligation to make them.

Of overriding significance is the fact that these payments were made pursuant to a longstanding plan and practice. "The existence of a plan or practice", this Court has remarked, "is most persuasive against the theory that a payment is a gift, and, we think it is decisive where a benefit to the Company is expected." Tomlinson v. Hine, 5 Cir. 1964, 329 F.2d 462, 466. Other courts, called on to characterize payments made under a plan or practice, have consistently refused to characterize them as gifts. See, e. g., Cronheim's Estate v. Commissioner, 8 Cir. 1963, 323 F.2d 706; Gaugler v. United States, 2 Cir. 1963, 312 F.2d 681; Smith v. Commissioner, 3 Cir. 1962, 305 F.2d 778; Simpson v. United States, 7 Cir. 1958, 261 F.2d 497;

Bausch's Estate v. Commissioner, 2 Cir. 1951, 186 F.2d 313.[8] When, on the other hand, courts have characterized payments to a widow as gifts, they have commonly emphasized that the company had no plan, policy, or practice of making such payments. See, e. g., Grinstead v. United States, 7 Cir. 1971, 447 F.2d 937; United States v. Pixton, 5 Cir. 1964, 326 F.2d 626; Carson v. United States, 1963, 317 F.2d 370, 161 Ct.Cl. 548; United States v. Frankel, 8 Cir. 1962, 302 F.2d 666, cert. denied, 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165; Rice v. United States, E.D.Wis.1961, 197 F.Supp. 223. See also Poyner v. Commissioner, 4 Cir. 1962, 301 F.2d 287.

The Graybar plan, as written and as administered, effectively dispels any suggestion of elements of affection, admiration, respect, or charity. Although the company retains discretion as to whether to make payments in individual cases, nothing in the record suggests that the personal qualities or contributions of the decedents or their beneficiaries ever affected the exercise of that discretion. Indeed, we would be surprised to find in a company of Graybar's size that more than a few of the shareholders, much less their beneficiaries, were personally known to those authorizing the payments.[9] So also, nothing suggests that Graybar inquired into, or tailored payments to, the circumstances and needs of individual recipients. Certainly there is no indication in the record that Graybar gave any consideration to Mr. Jensen's circumstances. On the contrary, Graybar makes these payments only to the estates or beneficiaries of stockholders and only on the redemption of their stock. It calculates the amounts to be paid exclusively by reference to the number of shares redeemed. And these benefits are paid in addition to, and irrespective of, amounts which may be receivable under the company's regular death benefits plan.

If there is little in this plan to suggest generosity or sympathetic beneficence, there is much to suggest corporate self-interest.[10] Certainly the plan must serve as an inducement to employees to participate in the company's stock purchase plan, through which Graybar receives, presumably, a good portion of its working capital. Indeed, in formulating the plan, the company expressly acknowledged the contribution of the employee "who as a shareholder has furnished part of the working capital of the company during his lifetime".

The company, in instituting the "special death benefits plan", was undoubtedly mindful of the effect the plan might have on employee willingness to participate in the company's stock purchase plan. The genesis of the "special death benefits plan" is, alone, enough to suggest such an awareness. The plan, when first considered, was expressly conceived as an amendment to the stock purchase plan and designed to provide additional redemption payments. It followed directly on the earlier amendment to the stock purchase plan that had reduced the redemption price. The operative event that triggers the discretion under the plan to make payments is not the stockholder's death itself but the ensuing redemption of his shares.[11] These

---

8.  See also Fitch v. United States, D.Kan.1969, 299 F.Supp. 1170; Security First National Bank v. United States, S.D.Cal.1966, 66–2 U.S.Tax Cas. 87,058; Joyce v. Commissioner, 1966, 25 CCH Tax Ct.Mem. 914; Meyer v. United States, S.D.Cal.1965, 244 F.Supp. 103; Spear v. Vinal, D.Neb.1965, 240 F.Supp. 33; McCarthy v. United States, D.Mass.1964, 232 F.Supp. 605; Landry v. United States, E.D.La. 1964, 227 F.Supp. 631; Froehlinger v. United States, D.Md.1963, 217 F.Supp. 13, aff'd, 3 Cir. 1964, 331 F.2d 849; Wilner v. United States, S.D.N.Y.1961, 195 F.Supp. 786. But

see Kaiser v. United States, 1960, 363 U.S. 299, 80 S.Ct. 1204, 4 L.Ed.2d 1233; United States v. Allinger, 6 Cir. 1960, 275 F.2d 421.

9.  Recall that between 1960 and 1972 there were no fewer than 273 redemptions.

10.  We might also note that the authors of the plan were, presumably, among its potential beneficiaries.

11.  Section 101(b) of the Internal Revenue Code exempts from taxable income the first $5,000 paid the beneficiaries or estate of a deceased employee, "by reason of the death

benefits, then, are essentially substitutes for, and, arguably, equivalents to, the additional payments made under the original plan to reflect increases in fair market value.

■ That Graybar is under no legal obligation to make these payments does not vitiate the tax importance of Graybar's plan and practice. The voluntariness of even an isolated transfer does not require the conclusion that the transfer constitutes a gift. See Commissioner v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218; Old Colony Trust Company v. Commissioner, 1929, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918. And, as numerous decisions indicate, the existence of a plan or practice remains persuasive against the contention that payments under it constitute gifts even though their disbursement is discretionary with the transferor. See, e. g., Tomlinson v. Hine, 5 Cir. 1964, 329 F.2d 462; Simpson v. United States, 7 Cir. 1958, 261 F.2d 497; Bausch's Estate v. Commissioner, 2 Cir. 1951, 186 F.2d 313.

Finally, we are unable to accept the conclusion reached in *Harper* and *Pearson* that Graybar had no moral obligation to pay special death benefits. Both courts, in reaching that conclusion, stressed the discretionary aspect of the plan and the refusal to pay benefits in certain cases. But Graybar has declined to pay these benefits in only six of four hundred and sixty-six redemptions. While the record casts no light on the company's reasons for denial of benefits in the first four cases, it does show that in the only two cases from 1960 through 1972 in which benefits were denied, the sole reason was that the designated beneficiaries were deemed too remotely related to the deceased shareholders. These denials, then, are consistent with the limitation implicit in the plan to make payments only to those close relatives of the shareholder who would be eligible to receive "regular death bene-

fits". There have been no deviations from the plan as so administered.

The court in *Pearson* admitted that "the inference is reasonably drawn that employees of Graybar buy stock in the expectation that 'special death benefits' will be paid to the beneficiary [*sic*] of their estates." Yet it concluded that the explicit caveat included in the plan put purchasers on notice that their expectations are "based only on . . . a long standing custom." We pass the question whether the expectations generated by this plan and practices followed under it entail a moral obligation to continue the plan. But we are convinced that, so long as the plan remains in effect, Graybar must perceive a moral obligation to administer that plan evenhandedly and to base the determination whether to make payments on neutral criteria. The plan did, in fact, continue after these payments had been made. We cannot believe that Graybar could in good conscience have refused to make the payments to Mrs. Jensen's estate while continuing to make them to others similarly situated.

■ The taxpayer bears the burden of showing that he was entitled to exclude these payments from his gross income. Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Gibbs v. Tomlinson, 5 Cir. 1966, 362 F.2d 394. We have canvassed the record for evidence to support the lower court's conclusion that the taxpayer has shouldered his burden. But the sole support we find for the contention that these payments, made under a long standing and published plan, constitute gifts, is the absence of legal obligation. This alone is not enough. We find nothing to indicate affection, admiration, respect, charity, or like impulses as the dominant reasons for these payments. Instead we find substantial benefits to the corporation and its shareholders. The trial court

---

of the employee." Apart from the fact that this section has not been put in issue here, it is, we think, inapplicable as these payments were made in connection with the redemption

of stock, and not simply "by reason of the death of the employee." Graybar does have a "regular death benefits" plan whose coverage is in no way related to stockholding.

erred, therefore, in holding that these payments were gifts.

Because these payments have not been shown to come within a specific statutory exemption, they must fall within the broad language of Section 61(a) of the Internal Revenue Code, which defines gross income as "all income from whatever source derived". In this refund suit, we need not reach the question whether these payments with respect to redeemed stock" and treated as long term capital gains, or whether, for example, they constitute distribution of corporate profits taxable under Section 301 of the Code, or simply "other income". They are, in any event, taxable items, so that the taxpayer is entitled to no refund.

The judgment of the district court is therefore

Reversed.