JAMIE L. ABDELLA AND LEOTA T. ABDELLA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Abdella v. Commissioner
Docket No. 3077-80.
United States Tax Court
T.C. Memo 1983-616; 1983 Tax Ct. Memo LEXIS 174; 46 T.C.M. (CCH) 1602; T.C.M. (RIA) 83616; September 28, 1983. Thomas N. Chambers and James R. Snyder, for the petitioners. Robert J. Kastl, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined a deficiency of $13,426.40 in petitioners' 1976 Federal income tax. The sole issue is whether a payment of $30,000 to petitioners was a nontaxable gift under section 102(a). [1]
*175 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Jamie L. Abdella (hereinafter "petitioner") and Leota T. Abdella, husband and wife, resided in Marlinton, West Virginia, at the time they filed their petition in this case. Petitioners filed a joint Federal income tax return for the taxable year 1976 with the Internal Revenue Service Center at Memphis, Tennessee. In 1967, Edsel L. Lucas ("Lucas") and S. Franklin Burford ("Burford") each acquired 50 percent of the outstanding stock of Spruce Coal Sales, Inc. ("Spruce Coal"). Their total capital investment in Spruce Coal was less than $100,000. Spruce Coal owned 87 percent of the stock of S.S. "Joe" Burford, Inc. ("Burford, Inc."). Skip Carson ("Carson") and J.E. McDavid ("McDavid") owned equally the remaining 13 percent of the Burford, Inc., stock. Burford, Inc., was primarily engaged in the business of mining coal, and Spruce Coal was the sales organization. Lucas and Burford were officers of both Burford, Inc., and Spruce Coal from before 1970 through November of 1976. Carson and McDavid *176 were not active in the management of Burford, Inc.
In 1967, Burford, Inc., was a very small scale mining business and its financial position was precarious. The years 1970 to 1972 were years of struggle for Burford, Inc., and its fiscal health worsened during this period. However, during the years 1974 to 1976 its fiscal health improved markedly. In November of 1976, Lucas and Burford sold all of their Spruce Coal stock to Valley Industries, an unrelated third party. Each of them made a profit of over $4,000,000 and each received full payment of that amount by certified check. At the same time, Carson and McDavid also sold their stock in Burford, Inc., (the remaining 13 percent of Burford, Inc.'s outstanding stock) to Valley Industries. Carson and McDavid each received approximately $500,000. [2]
*177 Petitioner began working for Burford, Inc., in 1970 as a heavy equipment operator. Late in 1972, petitioner was promoted to superintendent of the company's strip mining operations and was employed by Burford, Inc., in that position at the time of the stock sale. He continued to work for Burford, Inc., until sometime in 1979, when he went to work for Rehobeth Coal Company ("Rehobeth Coal"). [3] Lucas owned two-thirds of Rehobeth Coal's stock. Petitioner, an outstanding mining superintendent, was a very valuable employee to Burford, Inc., contributing greatly to its success. Petitioner, through his efforts for Burford, Inc., aided the wealth that Lucas and Burford derived from their sale of their Spruce Coal stock. After Valley Industries took over Burford, Inc., through the stock purchase, petitioner's salary *178 was not increased, nor was it increased in 1979 when petitioner left Burford, Inc., to work for Rehobeth Coal. See footnote 3. During the period petitioner worked for Burford, Inc., his salary was comparable to the salaries received by persons holding comparable jobs with other coal companies. Petitioner was adequately compensated for his services. In early December of 1976, after they had sold their Spruce Coal stock, Lucas and Burford each paid petitioner $15,000 by personal checks. About the same time, Lucas and Burford also made some payments to three other employees or former employees of Burford, Inc: Jim Little, Robert Phillips, and Rosa Runyon. The record does not show the amount paid to either Jim Little or Robert Phillips, but Rosa Runyon received $5,000 from Lucas and a similar amount from Burford. Jim Little was still an employee of Burford, Inc., at the time of the stock sale, but both Robert Phillips and Rosa Runyon had left the company's employ in 1970 or 1971. Lucas also paid $2,000 to Cecil Washburn, who had left Burford, Inc.'s employ early in 1976. When Washburn left Burford, Inc., Lucas and Burford had promised Washburn some additional compensation stretched *179 over 30 to 60 days. [4] Washburn violated the terms of his agreement with Burford, Inc., and Burford felt that Washburn should not receive the additional compensation. After Lucas and Burford sold their Spruce Coal stock, Washburn called Lucas and persuaded Lucas to pay him the $2,000. Burford made no payment to Washburn, because of "personal difficulties" with him. When Burford, Inc., hired Jim Little early in 1976, Lucas and Burford were contemplating selling their Spruce Coal stock. Little had left a job in Charleston to go work for Burford, Inc. Lucas and Burford agreed to pay Little one year's salary if they sold Burford, Inc., within his first year, [5] which in fact they did. It was pursuant to this understanding that Lucas and Burford paid Little in December of 1976. There was no agreement or understanding that Lucas *180 and Burford would pay petitioner any money upon the sale by Lucas and Burford of their Spruce Coal stock. Lucas and Burford were under no contractual obligation to make any payments to petitioner, to Runyon, or to Phillips. Lucas and Burford never consulted with Carson and McDavid, Burford, Inc.'s former minority shareholders, regarding their payments to present and former Burford, Inc., employees. Carson and McDavid did not contribute any funds to any of the Burford, Inc., employees receiving these payments from Lucas and Burford. Except for these payments in December of 1976, Lucas and Burford had never paid anyone in either Spruce Coal or Burford, Inc., with personal checks. Had they not sold their Spruce Coal stock and made a substantial profit on it, Lucas and Burford would not have made these various payments to petitioner, Runyon, and Phillips. Petitioner had previously received bonus payments from Burford, Inc., by company checks and from which taxes were withheld. When he received the two checks from Lucas and Burford, petitioner specifically asked them about taxes on the $30,000, so that he would know how much of it he could spend. Lucas and Burford specifically *181 told petitioner that the taxes had been taken care of, that the checks were gifts, and that he did not have to pay taxes on gifts. Lucas was not knowledgeable about tax matters and relied upon Burford. Burford had directed Lucas to advise petitioner that he should treat the payment as a gift. Burford had attended New York University's graduate tax program in 1956 and had practiced tax law in New York City from 1956 to 1961 and in other localities until his acquisition of his Spruce Coal stock (and derivative ownership of Burford, Inc.) in 1967. Burford had also taught tax law for three years at Emory University's School of Law. Burford intended petitioner to rely upon his advice to treat the payments as gifts, and he believed that petitioner would so rely. When Lucas sent his check for $5,000 and Burford's check for $5,000 to Rosa Runyon, he enclosed the following note: Dec. 12, 1976 Dear Rosa, I assume you know by now that Frank [Burford] and I have sold the S.S. "Joe" Burford Co.
We both feel that you played a very important part in the formation of that company, especially during the hard lean years. We hit it very lucky after we moved to Randolph County. Because *182 of your contribution to the sucess (sic) of the Burford, Co. we would like to show our appreciation to you by saying "thanks Rosa" and by enclosing a check from each of us for $5,000.00. Sincerely s/ Edsel [Lucas] Lucas' reasons for making his $15,000 payment to petitioner were the same as his reasons for paying Rosa Runyon $5,000. Both Lucas and Burford claimed deductions on their personal income tax returns for their respective payments to Burford, Inc., employees and former employees, including the $15,000 they each paid petitioner. At the time this case was tried, both Lucas and Burford had petitions pending with the Court for the calendar year 1976 that involved, interalia, the deductibility to Lucas and Burford of their payments to petitioner and the other Burford, Inc., employees and former employees. See Lucas v. Commissioner, docket No. 4129-80; Burford v. Commissioner, docket No. 12466-80. Neither Burford nor Lucas included the payment of $15,000 to petitioner Jamie L. Abdella on the gift tax return that each one filed for the quarter ended December 31, 1976.
On their 1976 joint Federal income tax return, petitioners did not report as *183 income the $30,000 received from Lucas and Burford, instead treating the payments as gifts. In his statutory notice of deficiency, respondent determined that these payments were taxable income. OPINION Section 61(a) provides that gross income includes all income from whatever source derived unless excluded by a specific provision of the Code. Section 102(a) excludes from gross income the value of property acquired by gift. Whether a payment is a gift under section 102(a) or gross income under section 61(a) is a factual question, and the criteria have evolved from numerous judicial determinations. In Commissioner v. Duberstein,363 U.S. 278, 285-286 (1960), the Supreme Court stated the governing principles in this area: [T]he mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. * * * And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated *184 benefit" of an economic nature, * * * it is not a gift. And, conversely, "[w]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it." * * * A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," * * * "out of affection, respect, admiration, charity or like impulses." * * * And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." * * * "What controls is the intention with which payment, however voluntary, has been made." [Footnotes and citations omitted.] The intention of the transferor or donor is primarily a determination of fact "based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." Commissioner v. Duberstein,supra at 289. We must make an objective inquiry into the circumstances surrounding the transfer rather than relying on the transferor's subjective characterization *185 of the transfer. Commissioner v. Duberstein,supra at 285; Bogardus v. Commissioner,302 U.S. 34, 43 (1937). Applying the principles set forth in the case law to the facts of this case, we conclude that the payments petitioner received from Lucas and Burford were gifts within the meaning of section 102(a). We have found that Lucas and Burford were under no legal obligation to make these payments to petitioner from the stock sale proceeds. [6] Nor was there any understanding or expectation that petitioner would share in the proceeds of the sale of stock. And although Burford and Lucas testified that they felt "morally obligated" to make these payments, we find no moral obligation or duty to do so. As we read the case law, the "moral obligation" or "moral duty" contemplated by the Supreme Court in Duberstein involves an unenforceable promissory obligation where the recipients expect payment, or the payor expects to receive future benefits, or both. See Pearson v. United States,519 F. 2d 1279 (4th Cir. 1975) (payment of special *186 death benefits to widow of deceased employee-stockholder); Jensen v. United States,511 F. 2d 265, 272 (5th Cir. 1975) (payment of special death benefits to widow of deceased employee-stockholder); [7]Simpson v. United States,261 F. 2d 497, 501 (7th Cir. 1958) (payment to widow of deceased executive); Placko v. Commissioner,74 T.C. 452, 456-457 (1980) (strike benefit payments from union); Brown v. Commissioner,47 T.C. 399, 408 (1967), affd. per curiam 398 F. 2d 832 (6th Cir. 1968) (strike benefit payments from union); Hagar v. Commissioner,43 T.C. 468, 484 (1965) (strike benefit payments from union). [8]
*187 Although it is commendable and appropriate for investors like Lucas and Burford to share their bounty with corporate employees like petitioner, whose efforts on behalf of the corporation enhanced the value of and ultimate profit on their corporate investment, this hardly rises to the level of a moral obligation or duty. Petitioner did not expect to receive these payments, and Lucas and Burford did not expect to receive any future benefits from the payments to petitioner. [9] To find that corporate investors like Lucas and Burford were morally obligated to share their profits with corporate employees like petitioner is to impose a standard of business morality wholly alien to our economic system of free enterprise. *188 Lucas and Burford deducted the payments to petitioner and the other employees on their individual income tax returns as compensation paid to them. Petitioner was an employee of the corporation, not of Lucas and Burford individually. Some cases have viewed deduction by the payor as a factor indicating the payment was not a gift. See Poorman v. Commissioner,131 F. 2d 946, 949 (9th Cir. 1942), affg. 45 B.T.A. 73 (1941); Willkie v. Commissioner,127 F. 2d 953, 956 (6th Cir. 1942), affg. an unpublished Memorandum Opinion of this Court dated Feb. 21, 1941. Although relevant, this factor is not conclusive. See Greentree v. United States,13 AFTR 2d 979, 64-1 USTC par. 9284 (E.D. Va. 1964), affd. 338 F. 2d 946 (4th Cir. 1964). The fact that the payors improperly claimed deductions should not preclude exclusion of the payment from the recipient's income as a gift if the payment was in fact a gift. As the Supreme Court stated in Commissioner v. Duberstein,supra,363 U.S. at 287-288: *189 [I]t is doubtless relevant * * * that the transferor treats a payment as a business deduction * * *. But [this inference] cannot be stated in absolute terms. * * * The taxing statute does not make nondeductibility by the transferor a condition on the "gift" exclusion * * *. The conclusion whether a transfer amounts to a "gift" is one that must be reached on consideration of all the factors. Respondent's argument that the payments represent additional compensation to petitioner because of past undercompensation is not borne out by the facts. Petitioner considered himself adequately compensated, both within his company and in comparison to persons doing comparable work for other coal companies. Although both Lucas and Burford suggested in their testimony that petitioner was undercompensated, petitioner's testimony to the contrary is supported by the objective facts. Indeed, it is notable that after Valley Industries took over Burford, Inc., it did not increase petitioner's salary. Likewise, Rehobeth Coal, owned principally by Lucas, did not increase petitioner's salary when he later left Burford, Inc., to go to work for Rehobeth Coal. Respondent's argument is also undermined *190 by the fact that Lucas and Burford never consulted nor sought payments from the minority shareholders, Carson and McDavid, who shared proportionately the "benefits" of petitioner's allegedly undercompensated past services. We are satisfied that petitioner was not undercompensated, and this factor militates against respondent's argument that the payments were additional compensation. See Bogardus v. Commissioner,supra,302 U.S. at 42. As we see it, Lucas and Burford, after selling their Spruce Coal stock at an enormous profit on a minimal investment, chose to share some of those profits with certain employees and former employees of the corporation they, indirectly, had previously owned. The fact that the recipient (petitioner) previously performed services for a corporation (Burford, Inc.) indirectly owned and controlled by the payors (Lucas and Burford) does not necessarily make the payments compensation for past services. See and compare Wright v. Commissioner,30 T.C. 392, 394-395 (1958); Estate of McAdow v. Commissioner,12 T.C. 311, 318-319 (1949). *191 See also Bogardus v. Commissioner,supra,302 U.S. at 44. [10] And although Burford and Lucas were intensely interested in the corporation's affairs, both as officers and as indirect shareholders, the fact remains that the business of the corporation is not the business of the shareholders. See Whipple v. Commissioner,373 U.S. 193, 202 (1963). That Burford and Lucas were no longer shareholders at the time of the payments and that they also made payments to persons whose employment with the corporation had ceased five years earlier substantially undermine any compensatory element that might have been found had there been a payment from the corporation and had there been a payment to petitioner alone. Indeed, Lucas' letter to Rosa Runyon, who had left Burford, Inc.'s employment five years before the payments, clearly expresses the payors' intent--"to show our appreciation to you by saying 'thanks' * * *." Moreover, the tone and format of the letter ("Dear Rosa" * * * "Sincerely Edsel") also indicates personal rather than business motivation. *192 Also probative are the contemporaneous statements of Lucas and Burford (the payors) to petitioner (the recipient) that the payments were "gifts" that petitioner did not have to pay any taxes upon. We believed petitioner's testimony as to those contemporaneous statements and found it consistent with the objective evidence in the record. [11]
*193 We conclude that the payments to petitioner by Lucas and Burford resulted from their generous decision to share the bounty of their enormous windfall with petitioner and other persons who, to some extent, may have helped enhance their profit on this stock sale. Such payments were motivated by "detached and disinterested generosity," "out of affection, respect, admiration or like impulses." Commissioner v. Duberstein,supra. Accordingly, such payments are gifts excludable from petitioner's gross income under section 102(a). Decision will be entered for petitioners.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question.↩
2. Under the terms of the stock sale, Lucas, Burford, Carson, and McDavid were entitled to royalty payments out of Burford, Inc.'s future coal production, up to amounts approximately equaling the actual payments for their stock. At the time this case was tried, Lucas and Burford each had received $600,000 to $800,000 in royalties; Carson and McDavid each had received perhaps $100,000 in royalties.↩
3. In 1978, dissatisfied with his working conditions at Burford, Inc., and the nature of the mining operations having changed, petitioner contacted Lucas seeking employment with Rehobeth Coal. At that time, Rehobeth Coal had no position to offer him. Subsequently, in 1979, Lucas contacted petitioner offering him a job with Rehobeth Coal, which petitioner accepted.↩
4. The record is unclear, but it would appear that this was a corporate obligation of Burford, Inc., that it incurred through its officers and directors, Lucas and Burford, not a personal obligation of Lucas and Burford.↩
5. It also appears that this was a corporate obligation of Burford, Inc., as with the payments to Washburn. See footnote 4.↩
6. The contractual nature of the payments to Little and Washburn does not diminish the significance of the noncontractual nature of the payments to petitioner, Runyon, and Phillips. This is especially true where it is likely that these contractual obligations to pay Little and Washburn were those of the corporation rather than of its shareholders, Lucas and Burford. ↩
7. Compare Harper v. United States,454 F. 2d 222 (9th Cir. 1971), involving a payment to a widow of an employee-stockholder of the Graybar Electric Company of the same type as in the Pearson and Jensen cases cited in the test, where the Ninth Circuit held that such payments were nontaxable gifts. The conflict in these cases involving the payments under the same Graybar payment plan demonstrates the differing results that may sometimes occur in analyzing the intent of the transferor, which the Supreme Court teaches us is "the most critical consideration" for the fact-finder to address in determining whether a payment constitutes a gift. Commissioner v. Duberstein,363 U.S. 278, 285-286↩ (1960). 8. We also note that in a different factual setting even a strike benefit paid by a union may be a nontaxable gift. United States v. Kaiser,363 U.S. 299↩ (1960).
9. Respondent has not argued that the payments to petitioner were compensation to induce him to greater productivity and efficiency with Burford, Inc., in order to enhance the value of the former shareholders' contingent royalty rights. See footnote 2. We do not consider this in our determination, although we note that the inclusion of former employees as recipients and the failure of McDavid and Carson, the minority shareholders, to make any such payments substantially undercut the force of any such argument.↩
10. The world of nontaxable gifts did not, as respondent suggests, begin anew with Commissioner v. Duberstein,363 U.S. 278 (1960). To the extent that pre-Duberstein cases seek to determine the transferor's intention, they retain vitality. See Jensen v. United States,511 F. 2d 265, 269-270 (5th Cir. 1975); Estate of Carter v. Commissioner,453 F. 2d 61, 64-65 (2d Cir. 1971); Poyner v. Commissioner,301 F. 2d 287, 292↩ (4th Cir. 1962).
11. Conversely, we did not believe the belated attempts of Lucas and Burford at the trial to change the characterization of what had been in 1976 a nice and generous action on their part. Lucas, unversed in tax matters, relied upon Burford's expertise. On direct examination, Burford testified as follows: Q Did Mr. Abdella ever question you regarding the tax consequences of this $30,000 to him? A Yes, he did. Q And what did you tell him? A I told him that my state of mind and the circumstances surrounding me determined the tax consequences to me and that they had no influence on the tax consequences to him and that the circumstances surrounding him and his state of mind when he received them would determine his tax consequences. He asked me what I thought that was, and I told him in my opinion it was gift to him, but compensation by me * * *. Any such legal advice by Burford would have been an astonishing error on the part of a tax lawyer. Since the Supreme Court's decision in 1960 in Commissioner v. Duberstein,363 U.S. 278 (1960), if not since its decision in 1937 in Bogardus v. Commissioner,302 U.S. 34 (1937), the law has been clear that the predominant factor in determining whether a payment is a gift is the intent of the payor. It is utterly incredible that Burford, a man who had attended New York University's tax school, who had practiced tax law for over 10 years, and who had taught tax law at Emory University's School of Law for three years, would advise petitioner, or direct Lucas to advise petitioner, that it was his (petitioner's) state of mind and surrounding circumstances as recipient that determined the tax consequences of the payments to him. The testimony of Burford and Lucas on this point is simply unworthy of belief, except perhaps as an expression of their rather cynical hopes that the parties to the transaction could somehow succeed in taking opposite positions for tax purposes, with only the public fisc as the loser. In any event, as the Supreme Court stated in Commissioner v. Duberstein,supra,363 U.S. at 286: "It scarcely needs adding that the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter." Thus, we disregard the subjective hopes or expectations of Lucas and Burford, and decide the case on the objective factors in the record. We are satisfied that at the time they gave the checks to petitioner, Lucas and Burford were acting from the same type of generous impulse that impelled the shareholders in Bogardus↩ to make their gifts. It would seem that their generous impulse to make a gift was transformed by the time of the trial into a new economic impulse to save on their personal taxes. Regrettably, what was conceived and born in generosity was later debauched and disowned in avarice.