**Joseph M. ARMENO**

v.

**The UNITED STATES.**

**No. 330–83T.**

United States Claims Court.

Oct. 30, 1984.

---

Michael H. Singer, Las Vegas, Nev., for plaintiff. Mark Segal, Las Vegas, Nev., of counsel.

Israel D. Shetreat, Washington, D.C., with whom were Asst. Atty. Gen. Glenn L. Archer, Jr. and Theodore D. Peyser, Washington, D.C., for defendant.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

WHITE, Senior Judge.

The plaintiff, Joseph Armeno, sues to recover a refund (plus interest) of the income tax which he paid for the calendar year 1979 on a $2,400 item that was included as part of his gross income in his return for 1979.

The $2,400 referred to in the preceding paragraph represented (according to the plaintiff) the total amount of the "tokes" (to be explained later) that he received in 1979.

The case is now before the court on the defendant's motion, and the plaintiff's cross-motion, for summary judgment.

### Agreed Facts

For the purposes of the court's consideration of the pending motions, the defendant—and therefore the court—accepts as accurate the factual statements contained in the plaintiff's pretrial statement, filed January 16, 1984, pursuant to the court's order on pretrial procedure.

During the calendar year 1979, the plaintiff was employed as a "craps" dealer at the Maxim Hotel & Casino, in Las Vegas, Nevada. Monday through Friday each week, there were usually two craps tables in operation; and on the weekend three tables were operated. Four dealers were at each table; and each table could accommodate up to 16 players. Frequently, players played at more than one table during a session of play.

The services performed by the plaintiff as a dealer involved operating the craps games in which players at the casino participated. The services included keeping track of bets, paying off on winning bets, cleaning off chips wagered on losing bets, and returning the dice to a player who had the roll.

The plaintiff's services as a dealer were supervised by other casino employees for a variety of reasons, including (among others): to ensure that the plaintiff gave no special favors, services, or attention to any particular player; to ensure that the hotel made the correct payoff to a winning player; to ensure that the money and chips wagered were collected; and to ensure that

the game was run according to established hotel procedures.

As a dealer, the plaintiff was paid a daily wage by the Maxim Hotel & Casino. For the year in question, this amount was approximately $27 a day.

During the course of a craps game at the Maxim Hotel & Casino, a player might either hand over chips directly to the dealer, with an indication that they were for him, or make a bet in the craps game for the benefit of the dealer. Even if a bet made on behalf of the dealer was won, the player could still remove those chips from the table and not allow the dealer to take them. If the player left the chips on the table, however, the dealer for whom they had been wagered would collect them.

The chips received by a dealer while operating a game, either directly from players or as a result of successful wagers made on his behalf, were commonly referred to as "tokes." The tokes, when received, were dropped by the dealer into a "toke box."

Fraternization and unnecessary conversation between dealers and players were discouraged by the casino management, as was "hustling" by dealers for tokes. If a dealer was discovered "hustling" for tokes, it could be cause for his dismissal.

Under the rules in effect at the Maxim Hotel & Casino during 1979, no dealer had any right to keep tokes received by him, but was required to turn all tokes which he might receive over to a common pool or fund of tokes. The tokes were later divided among all dealers eligible to receive them, in accordance with the plan explained in the next paragraph.

During 1979, the common pool or fund of tokes at the Maxim Hotel & Casino was accumulated and divided as follows:

All tokes received by all dealers—craps, roulette, twenty-one, mini-baccarat and "Big Six" wheel—were put into one box and were divided on a 24-hour basis for the entire casino. The number of shares into which the pool was divided equalled the sum of (a) the number of dealers working during the 24-hour period, (b) the number of dealers on vacation who had sufficient seniority entitling them to shares of the tokes, even though they were on vacation, and (c) a pre-determined number of shares for cage personnel. (There may also have been shares allocated to dealers on sick leave.)

The plaintiff could receive a share of the tokes pooled during a particular day, even though he might not have taken part in the operation of any game on that day.

All of the tokes reported by the plaintiff in his income tax return for 1979 were derived as his share of, and from, the common pool or fund of tokes which had been received by the plaintiff and other dealers from players.

In his federal income tax return for the year 1979, the plaintiff reported $2,400 in tokes on line 8, entitled "Wages, salaries, tips, etc." In addition, on Form 4137 (Computation of Social Security Tax on Unreported Tip Income), the plaintiff reported $2,400 in tokes on line 1, entitled "Total cash and charge tips received in 1979."

The plaintiff's 1979 federal income tax return was timely filed on April 15, 1980.

On November 22, 1982, the plaintiff timely filed on Form 1040X a claim for refund in the amount of $735, stating as follows:

I reported $2,400 as being "taxable tip income not reported to employer." This was incorrect as tips are not taxable income.

By means of a letter dated January 19, 1983, the Internal Revenue Service notified the plaintiff of the disallowance of his claim for refund, on the ground that "tips are considered as taxable income."

## Discussion

The legal issue to be decided by the court in this case is whether the $2,400 which the plaintiff received in 1979 from the tokes pool at the Maxim Hotel & Casino represented nontaxable gifts within the meaning of 26 U.S.C. § 102(a) (1982), as contended by the plaintiff and denied by the defendant. This section provides that "[g]ross

income does not include the value of property acquired by gift, bequest, devise, or inheritance."

*Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), is probably the leading authority on the question of how courts should proceed in determining whether a transfer of something from one person to another constitutes a gift for tax purposes. The Court in that case stated that a gift in the statutory sense "proceeds from a 'detached and disinterested generosity, * * * out of affection, respect, admiration, charity or like impulses' " (*id.* 363 U.S. at 285, 80 S.Ct. at 1197; citations omitted). Consequently, it is necessary to make a factual inquiry and determination as to what was the basic reason for the transferor's conduct, *i.e.*, the dominant reason that explains his action in making the transfer (*id.* at 286, 80 S.Ct. at 1197).

A taxpayer suing for a tax refund has the burden of proving all the facts necessary to establish his right to recover. *Jensen v. United States*, 511 F.2d 265, 272 (5th Cir.1975); *Carson v. United States*, 161 Ct.Cl. 548, 561, 317 F.2d 370, 377 (1963). Accordingly, the plaintiff in the present case has the burden of proving that the dominant reason motivating the undoubtedly numerous individuals whose transfer of tokes ultimately resulted in the plaintiff receiving the $2,400 involved here was a detached and disinterested generosity toward the plaintiff growing out of affection, respect, admiration, charity, or some similar impulse. *Commissioner v. Duberstein, supra*, 363 U.S. at 285–86, 80 S.Ct. at 1196–97.

The facts agreed to by the parties do not expressly reveal the dominant motives of the various individuals who were the sources of the $2,400 involved in this case.

Moreover, the plaintiff has not indicated in any of the papers filed with the court that he knows, or can possibly ascertain, the identities of these individuals, or any of them. A pretrial order that was issued by the court in this case required the plaintiff to file a pretrial statement setting out (among other things) "[a] list of the witnesses whom the plaintiff intends to present at the trial, giving as to each witness the name, address, and a clear but succinct indication of the issue or issues to which the testimony of the witness will relate." Pursuant to the directive just quoted, the plaintiff on January 16, 1984, filed a pretrial statement that included the following information:

(a) *Plaintiff's Witnesses.*

At this time, plaintiff expects to call the following witnesses at trial:

1. JOSEPH ARMENO
   1515 E. Harmon Ave., # 115
   Las Vegas, Nevada 89109

   Mr. Armeno will testify as to the circumstances surrounding his receipt of "tokes" and the policies of the Maxim Hotel & Casino regarding dealers' "tokes."

2. HARRIET L. GOLDFARB
   211 South First Avenue
   Arcadia, CA 91006

   Mrs. Goldfarb will testify as to the circumstances surrounding her making of gifts of tokes to dealers.

There is no indication in the response that the plaintiff personally knows anything about the identities or motivations of the individuals whose tokes ultimately resulted in the receipt of $2,400 by the plaintiff. Also, there is nothing to indicate that Mrs. Goldfarb was the transferor of any of the tokes represented in the $2,400 payment to the plaintiff, or that she is aware of the identities or motivations of any of the numerous individuals whose tokes were represented in the $2,400 payment.

Therefore, the plaintiff has not only failed to show in his cross-motion for summary judgment that he is entitled to a judgment as a matter of law, but he has also failed to show in the papers before the court that he could meet the burden of proof imposed upon him if the case were to go to trial.

It appears that neither this court nor its predecessor, the United States Court of

Claims, has dealt with the specific question of whether tokes received by dealers at gambling casinos are nontaxable gifts. Other courts, however, have considered this question.

In *Olk v. United States*, 536 F.2d 876 (9th Cir.1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 317, 50 L.Ed.2d 287 (1976), the facts were very similar to the facts in the present case. The evidence there indicated that dealers at Las Vegas casinos were not permitted to keep the tokes which they received, but were required to put them into a pool; and that the tokes collected during each shift were split equally among the dealers at the end of the shift. The trial court had held that tokes were gifts, but the appellate court reversed the decision of the trial court. In doing so, the Court of Appeals said that transfers of tokes by players to dealers were not acts of "detached or disinterested generosity"; but, instead, that "[t]ribute to the gods of fortune which it is hoped will be returned bounteously soon can only be described as an 'involved and intensely interested' act" (*id.* at 879).

*Bevers v. Commissioner*, 26 T.C. 1218 (1956), involved the question of whether amounts received by a dealer in a gambling casino as his share of the proceeds of wagers made by patrons for him and other dealers employed in the casino represented taxable income or gifts. In *Bevers*, tips to dealers were referred to as "side money" rather than tokes. Dealers were not permitted personally to retain the side money which they received, but were required to put it in the pool; and the pool was later distributed among all dealers. The claimant in *Bevers* contended that side money represented gifts and, therefore, was to be excluded from gross income. On the other hand, the Commissioner of Internal Revenue took the position that side money constituted taxable income.

The Tax Court held in *Bevers* that the side money was income and did not represent gifts. The court went on to say that in dealing the cards, spinning the roulette wheel, and paying the winning wagers, a dealer rendered services to the patrons of the casinos where the dealers were employed; and that the significant factor was that side money was received by a dealer as an incident of the services which he performed and as a direct result of his employment. 26 T.C. at 1220–21.

Although the United States Court of Claims apparently did not deal with the question of whether tips to dealers at gambling casinos were gifts or taxable income, that court in *Andrews v. United States*, 155 Ct.Cl. 584, 295 F.2d 819 (1961), did consider the question of whether tips received by taxi drivers constituted gifts or were part of their gross income. The court in a short opinion merely said (155 Ct.Cl. at 584, 295 F.2d at 819) that the tips in question should be included in gross income and that, in reaching this conclusion, it relied on the decision by the United States Tax Court in *Roberts v. Commissioner*, 10 T.C. 581 (1948), *aff'd*, 176 F.2d 221 (9th Cir.1949).

In *Roberts*, the Tax Court said (10 T.C. at 584) that "the milk of human kindness has little to do with the matter" of tipping taxi drivers; that "the intent in paying taxi tips" is not "donative"; and that a "passenger tips because the taxi driver expects to receive tips, and the passenger expects to pay something extra for the service."

The Tax Court's decision in *Roberts* was affirmed by the Court of Appeals for the 9th Circuit, as indicated previously. In doing so, the appellate court reviewed the history of tipping to some extent, and later (176 F.2d at 225) made the following statement (among others):

> In tipping, the financial advantage is conferred on the basis of *a consideration which is related to service*. This makes it clearly income. * * * [Emphasis in original.]

■ On the basis of the facts agreed to by both parties and the judicial decisions previously referred to, the court infers, and finds as a fact, that the tokes which were the source of the $2,400 involved in this case did not represent acts of detached and disinterested generosity on the part of the players from whom the tokes were re-

ceived, but, instead, were received from the various players as incidents of the services rendered by the plaintiff and other dealers and as a direct result of the employment of the plaintiff and others as dealers.

### Conclusion

Accordingly, the court concludes that the $2,400 involved in this case was not a gift to the plaintiff, but instead was income to the plaintiff; that no genuine issue as to any material fact has been raised in the case; and that the defendant is entitled to a judgment as a matter of law.

The defendant's motion for summary judgment is therefore granted, and the plaintiff's cross-motion for summary judgment is denied.

The clerk will dismiss the complaint. IT IS SO ORDERED.